1          UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3        HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,            )
                                          )
6                    PLAINTIFF,           ) CASE NO.
                                          ) CR 11–963 PSG
7          VS.                            )
                                          )
8    JASON RAY PATTERSON,                 )
     RONALD GEORGE TOMICH,                )
9    AKA "RONKO TOMICH,"                  )
                                          )
10                   DEFENDANTS.          )
     _____)

11

12

13

14

15               REPORTER'S TRANSCRIPT OF
                   JURY TRIAL – DAY 6
16            THURSDAY, FEBRUARY 19, 2015
                       8:38 A.M.
17             LOS ANGELES, CALIFORNIA

18

19

20

21

22
     _____
23

              MAREA WOOLRICH, CSR 12698, CRR
24           FEDERAL OFFICIAL COURT REPORTER
            255 EAST TEMPLE STREET, ROOM 181-K
25           LOS ANGELES, CALIFORNIA 90012
                  mareawoolrich@aol.com


                  UNITED STATES DISTRICT COURT

1                          **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4          EILEEN M. DECKER
           UNITED STATES ATTORNEY
5          BY:  MARK AVEIS
           STEVEN ARKOW
6          BYRON MCLAIN
           Assistant United States Attorneys
7          United States Courthouse
           312 North Spring Street
8          Los Angeles, California 90012

9

10    **FOR DEFENDANT JASON PATTERSON:**

11         MESEREAU & YU LLP
           BY:  THOMAS MESEREAU
           SUSAN C. YU
12         10390 Santa Monica Boulevard, Suite 220
           Los Angeles, California 90025
13         (310) 789-1177

14

15    **FOR DEFENDANT RONALD GEORGE TOMICH:**

16         LAW OFFICES OF HARLAND W. BRAUN
           BY:  HARLAND W. BRAUN
17         1880 Century Park East, Suite 710
           Los Angeles, California 90067
           (310) 277-4777
18

19

20

21

22

23

24

25

                      **UNITED STATES DISTRICT COURT**

1

**I N D E X**

2

THURSDAY, FEBRUARY 19, 2015

3

4

---------------------------------------------------------

5

**CHRONOLOGICAL INDEX OF WITNESSES**

6

7

WITNESSES                                            PAGE

8

SHERINE EBADI
     DIRECT EXAMINATION RESUMED BY MR. AVEIS        30

9

10

ROBERTO AMENTA
     DIRECT EXAMINATION BY MR. AVEIS               64

11

12

TIMOTHY LEE
     DIRECT EXAMINATION BY MR. AVEIS               71
13   CROSS-EXAMINATION BY MS. YU                    94
     REDIRECT EXAMINATION BY MR. AVEIS             97

14

RUSSELL BOSCHETTI
15   DIRECT EXAMINATION BY MR. ARKOW               99
     CROSS-EXAMINATION BY MR. MESEREAU            117
16   REDIRECT EXAMINATION BY MR. ARKOW            137

17

18

---------------------------------------------------------

19

**INDEX OF EXHIBITS**

20

<u>MARKED FOR IDENTIFICATION</u>

21

EXHIBIT NOS. 2008 AND 2009                          31

22

23

<u>RECEIVED INTO EVIDENCE</u>

24

EXHIBIT NOS. 2000 AND 2001                          76
25   EXHIBIT NOS. 2003A AND 2004A                     31

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, FEBRUARY 19, 2015

 2                              8:38 A.M.

 3                               -oOo-

 4

 5              THE COURT:  With regard to the Government's Motion

 6    in Limine No. 10 to introduce at trial certain proffer

 7    statements made by Defendant Patterson, defense may be heard.

 8              MR. MESEREAU:  Your Honor, our position is that, if

 9    you are going to bring out any of his statements, the entire

10    interview should come out in the interest of fairness.  To

11    selectively and carefully and we think, rather prejudicially,

12    carve out little snippets of answers to questions and not have

13    the whole flavor, the whole context -- these are complex

14    transactions in a sense.  The jury has been bombarded with

15    nomenclature regarding agents and lending and underwriting,

16    et cetera.

17         And we think it would be grossly unfair for them to

18    selectively carve out little snippets of answers to questions.

19    Everything has to be in context.  Mr. Patterson throughout that

20    interview said I've not done anything wrong, and he --

21    everything sort of extends from that.

22         They've chosen to selectively cull out a few things, put

23    them in their context.  I think the only way this can be fairly

24    done is -- and it was a queen for a day type of arrangement.

25    Their position is because Ms. Yu in her opening statement made
```

1    some statements they think are contrary, they think they have

2    the right to selectively cut out little snippets.

3         I'd also suggest, in a broader context, this is going to

4    have a real chilling effect on people in the future if they

5    think they show up for queen for a day and get subjected to

6    this based on what lawyer argument is made because lawyer

7    argument is not evidence.

8         Anyway, that's our position.

9         THE COURT:  Separate and apart from the argument,

10   it's pretty clear from the cross-examination that the defense's

11   position is that Mr. Patterson has nothing to do with 169.

12        MR. MESEREAU:  Well --

13        THE COURT:  Different and apart from just argument.

14        MR. MESEREAU:  We have a number of positions that

15   we've made throughout this, and we are going to tie them up in

16   the end.  But this is highly prejudicial to just selectively

17   cull out a couple of answers.

18        THE COURT:  All right.  Mr. Braun, do you have a

19   position?

20        MR. BRAUN:  We are slightly involved in it --

21        THE COURT:  I can't hear you.

22        MR. BRAUN:  We are slightly involved.  It's not the

23   same.  It wasn't a queen for a day.  My client voluntarily

24   talked to them on four separate occasions.  Apparently they

25   want to bring out some of his statements.

**UNITED STATES DISTRICT COURT**

```
 1            THE COURT:  That's not before me right now.  I don't
 2   know -- I had no indication they were going to use any of the
 3   proffers.
 4            MR. BRAUN:  I don't know.  Maybe I just assumed.
 5   Are they going to be -- maybe the Court can ask them.  Are they
 6   going to be bringing statements out by my client?
 7            THE COURT:  I'm not aware of anything like that.
 8       Is the government going to present -- later on have any
 9   proffers as to Mr. Tomich?
10            MR. AVEIS:  No proffers as to Mr. Tomich.  Four
11   interviews that we fronted yesterday at the sidebar and, as
12   mentioned, that we intend to have Agent Ebadi talk about
13   statements voluntarily made by Mr. Tomich during various
14   interviews with her or other agents.  So it is not a proffer
15   situation with Mr. Tomich at all.
16            MR. BRAUN:  Our situation is then the same as the
17   co-defendant is that, if they bring out statements for
18   Mr. Tomich, we have a right to bring out, at the very minimum,
19   the circumstances under which the statements were made, the
20   context in which they were made, and that's --
21            THE COURT:  But the doctrine of completeness doesn't
22   apply to oral statements.
23            MR. BRAUN:  Well, I don't think that is -- that's --
24   you know, just because something's -- that case, the *Ortega*
25   case basically says that you can't bring totally unrelated
```

1    statements into it.  If you are going on one subject matter,

2    you can't bring a statement on another subject matter.

3        The section itself refers to 356 of the California

4    Evidence Code under the notes, which says that basically a

5    statement that comes in has to be placed in the context.  It

6    doesn't mean you can bring in extraneous statements that have

7    nothing to do with it.

8        But if they bring in a statement and there's a portion of

9    the statement that is necessary to understand the

10   circumstances -- in fact, Your Honor's own Jury Instruction

11   No. 33 tells the jury to consider the context in which the

12   statement is made.

13       So I believe we do have -- and, of course, it would be

14   more helpful if the government would tell us which statements

15   they were offering.  That way I could anticipate reading

16   through, you know, 50 pages of interviews rather than doing it

17   on the fly.  They've given us no proffer.

18            THE COURT:  So how can I make a ruling as to whether

19   the statement is out of context if I don't know what they are?

20            MR. BRAUN:  I'm just saying in the abstract if --

21            THE COURT:  What are the statements that -- do you

22   know what statements you are going use as to Mr. Tomich?

23            MR. AVEIS:  Well, generally there were four

24   interview reports.  Mr. Tomich -- and they were all provided in

25   discovery over a year ago.

1          THE COURT:  Right.

2          MR. AVEIS:  The statements by Mr. Tomich relate to

3    specific transactions and his dealings with Allen Dana or

4    others.  It's very clear from those statements what the

5    government would seek to introduce, obviously the incriminating

6    or inculpatory parts.

7          To the extent that there are any exculpatory parts, as we

8    briefed, whether you're dealing with a proffer statement or an

9    interview statement that isn't subject to a queen for a day

10   letter, the analysis is the same.  Mr. Braun can certainly talk

11   about the context in questions, for example, where was the

12   interview, how were the questions posed, what have you.  But in

13   terms of anything that would be, you know, false exculpatory or

14   exculpatory, that's plainly hearsay.

15         And in response to the point about whether there's an

16   interplay between the rule of completeness and hearsay, the

17   hearsay rule trumps that.  Hearsay is just plainly

18   inadmissible.  So our view is that we vetted that.  We know

19   what we are going to introduce.  Mr. Braun has had the

20   opportunity.

21         But, more importantly, I think, in terms of how we deal

22   with this practically, the agent will be on the stand.  I will

23   ask, for example, did Mr. Tomich say that, for example, he had

24   met Allen Dana?  The answer is yes.  What did he say?  And

25   she'll give that statement.

1              MS. YU:  Your Honor, if I may.

2              THE COURT:  Hold on.

3         Mr. Braun, I think it's better -- I think it's more

4    appropriate for me to deal with it this way.  The government

5    will present their statements.  After direct, if you want to

6    ask questions about other portions of the statement, let me

7    know, I'll look at it and say yes or no.

8              MR. BRAUN:  That's agreeable.

9              THE COURT:  Okay.  Ms. Yu?

10             MS. YU:  Yes, Your Honor.  As to Exhibit 169A, in my

11   opening statement, the only thing I said, Your Honor, was the

12   fax header, page 1 of 2 was missing.  I didn't really say

13   anything to contradict, but the government is saying that we

14   contradicted from the proffer.

15        It's on page 23 of Exhibit B, Your Honor.  It's a

16   transcript page.  It's 8 of 13.  But it says on line 9, page 23

17   of the transcript, I said, "Please pay attention to the fax

18   header.  There's fax page 1 of 2 missing."  And I don't say

19   anything about that particular document.

20             THE COURT:  I don't think your -- your literal

21   reading of the transcript is entirely inconsistent with the

22   theme of your opening statement.  I think the theme of the

23   opening statement is that Mr. Patterson is a real estate agent

24   and specifically -- and the buyer -- he has no involvement and

25   he had no involvement in the case whatsoever.  The buyer was

1   dealing with the lender.  Mr. Patterson doesn't know what's

2   going on.  That's the extent of his involvement.

3       I think the theme of the case has always been that a real

4   estate agent simply is a scrivener between the buyer and the

5   seller to negotiate and to put to writing what the ultimate

6   agreement is between the buyer and seller.  That's been the

7   consistent theme of the case, and I think it's a consistent

8   theme of cross-examination.

9       Whether it was of the female escrow agent, Renna -- I

10  forgot her last name because I read the statements -- is that

11  this didn't come from Mr. Patterson in any way.  And I think

12  it's clear from Mr. Patterson's statements that he, in fact,

13  did the template and that there's no doubt in my mind that the

14  defense has opened the door to that -- whether it's through

15  opening statement and cross-examination of the witnesses.

16          MS. YU:  Your Honor, our position has been, you are

17  correct, that Mr. Patterson has no involvement in the fraud.

18  He is, in essence, a messenger providing information to the

19  people who need them.  But he never did anything knowingly.  He

20  had no idea what was going on behind the scenes.  That's been

21  on our theme, Your Honor.

22          THE COURT:  The theme is that he has nothing to do

23  with the documents related to the loan other than what he

24  prepares as a real estate agent, the purchase -- purchase and

25  sale agreement.  The position has been -- has not -- has been

1    much broader than that, is that he had no involvement with

2    lenders, mortgage brokers, escrow agents.  And this statement

3    is contrary to the position the defense has taken.  There's no

4    doubt in my mind about that.

5            MS. YU:  There's been no substantive involvement.

6    Mr. Jason Patterson is going to testify, and he's going to

7    explain every detail of the transaction that the government is

8    alleging he --

9            THE COURT:  If that's the case, then how is the

10   proffer prejudicial if Mr. Patterson is, in fact, going to

11   testify as you just represented?

12           MR. BRAUN:  Your Honor, I think it's prejudicial to

13   suggest that in an interview this is all he said.

14           THE COURT:  Okay.  All right.  I got it.

15           MR. BRAUN:  May I just add one thing?  Just adopting

16   from the government's own brief, they say on one page, "Trial

17   Court may admit oral statements under the rule of completeness

18   but only to the extent the statement proffered by the opponent

19   is needed to clarify or explain the admitted portion."  I think

20   that's our position.

21           THE COURT:  All right.  So when I see what you want

22   to introduce --

23           MR. BRAUN:  Right.

24           THE COURT:  Okay.  All right.  The Government's

25   Motion in Limine No. 10 is granted.

**UNITED STATES DISTRICT COURT**

```
 1          Any objections to the charts that have been -- I'm
 2   assuming that they've been changed to separate?
 3          MR. BRAUN:  Yes, Your Honor.
 4          MR. AVEIS:  Yes, Your Honor.  I provided the clerk a
 5   copy.  I don't know if the Court has the new version.  It has
 6   two pages.  The Patterson-related transactions are on the front
 7   and back of the first page, and the Tomich-related transactions
 8   are on the second page.
 9          THE COURT:  Any objection from counsel for
10   Mr. Tomich?
11          MR. BRAUN:  Yes, Your Honor.  In the first place,
12   they should be separated into two different exhibits,
13   obviously, not page 1 and page 2.  But more specifically --
14          THE COURT:  Mine isn't numbered.  They are stapled,
15   but they are not numbered.  Go ahead and separate them, and for
16   identification -- we are not going to introduce it -- we're not
17   going to admit it.  But, for the record, we should -- you are
18   not proposing to send these back to the jury room?
19          MR. AVEIS:  Yes.  Our view is under the voluminous
20   records rule, FRE1006, the chart is evidence.  The underlying
21   documents, provided they've been produced in discovery, do not
22   need to be received as opposed, for example, to rule 611a --
23          THE COURT:  I think that -- I'm sorry to interrupt,
24   but I thought that -- you may be right.  Yesterday the
25   representation to me was -- at least as I understood it was
```

```
 1    that we are going to distribute to the jurors, they are going
 2    to give them back, and that was it.
 3              MR. AVEIS:  Yeah.  It was point -- someone pointed
 4    out that I made a comment that might be misconstrued.  And what
 5    I meant was in distributing these to the jurors so that they
 6    could follow along with the testimony.  What I meant was that
 7    while we are in trial and before they deliberate.  It was not
 8    my expectation or belief that they ought to be leaving -- the
 9    jurors ought to be leaving the room with them in their coat
10    pockets.  But at the end of the day, the government does
11    seek -- will seek to have these charts be received.
12              THE COURT:  Let's mark them as whatever we are going
13    to mark them as, and then after the government -- when we talk
14    about the Rule 29 this afternoon, we can also talk about
15    admission of these two documents.
16              MR. AVEIS:  All right.  So we'll independently
17    determine the next number in line.  I think it's 07.  2008 will
18    be the Patterson-related exhibit, page 1.  And 2009 will be the
19    Tomich-related --
20              THE COURT:  All right.  So we'll talk about them,
21    and then after -- at the end of the day when we talk about
22    Rule 29, we'll talk about if there's any objection to admission
23    of these two charts.
24              MR. AVEIS:  Very well.  So -- but, if I may, before
25    we have the witness discuss this, Mr. Braun has made a couple
```

**UNITED STATES DISTRICT COURT**

```
 1    objections, and maybe they need to be vetted before --
 2              MR. BRAUN:  I transmitted to them electronically.
 3    Yeah, the -- for example, on the chart, what is this thing
 4    about property status and loss, the foreclosures?  There's no
 5    evidence about foreclosures and how much the loss is.  And what
 6    is -- and what is the jury supposed to decide about that, and
 7    what does it have to do with Mr. Tomich?  So that should not be
 8    there.
 9              THE COURT:  Okay.  Hold on a second.  Okay.
10              MR. BRAUN:  And then -- then the next objection is
11    on the last one -- the second one with the large dark across
12    it, all that is is an offer.  That was an offer that was made
13    to Mr. Kato in which my client specifically said there was
14    going to be $125,000 to consultation fees --
15              THE COURT:  Where -- I'm sorry.  I'm not -- where --
16    let me find what you are talking about first.
17              MR. BRAUN:  Let's see.  That would be the second
18    transaction on 2009.
19              THE COURT:  Okay.  Hold on.
20              MR. BRAUN:  609.
21              THE COURT:  609, okay.  Then specifically?
22              MR. BRAUN:  That's an offer.  And that's got no
23    evidentiary value at all.  That's not even a sale.  There's
24    nothing -- it was an offer.  Remember, Mr. Kato was on the
25    other end, and he didn't like the idea that there was money
```

UNITED STATES DISTRICT COURT

```
 1   going back to the buyer.
 2              THE COURT:  But isn't it consistent with the scheme?
 3              MR. BRAUN:  Not really, because the scheme is
 4   supposed to --
 5              THE COURT:  Come on.  Even though the jury is not
 6   here, don't --
 7              MR. BRAUN:  It doesn't really show anything.
 8   There's been no issue about that there's money going back to
 9   the buyer.  Even the -- even the financial people said that
10   there's nothing wrong with money going back to the buyer.
11              THE COURT:  Okay.  What else?
12              MR. BRAUN:  Then on the last one, 610, this is the
13   simultaneous escrow.  My client was involved in the first part
14   of -- the first part.  He had nothing to do with setting up the
15   second escrow.
16       And, in fact, Your Honor, so you'll understand the -- what
17   the sequence is that the 714 -- the 250, which was disclosed to
18   his office and which was then -- his office approved, there was
19   a memo that came out that said be cautious about any of these
20   payments back to the buyers.  And that's why the Baratas turned
21   down the first offer with that.
22       The second offer, which was without money going back to
23   the buyer, is the first leg of the simultaneous, and that was
24   because Mr. Dana was trying to get around Mr. Tomich because he
25   wouldn't do it anymore.  And so to lump this transaction to
```

1    Mr. Tomich is misleading.  They know that's not true.

2         THE COURT:  But isn't it fair game because of the

3    conspiracy allegations?

4         MR. BRAUN:  No, it's not at all.  There's no

5    evidence that he's even involved in that.

6         THE COURT:  Anything else on that chart?

7         MR. MESEREAU:  Yes.

8         THE COURT:  Let me just deal with Tomich first.

9       What about -- I'd like to discuss the column as it relates

10   to both -- there's been no evidence about foreclosures or

11   property loss.

12        MR. AVEIS:  Yes.  First of all, that information is

13   relevant.  We have a proposed Jury Instruction No. 13 that --

14   it's been disputed, but it's the instruction based upon

15   Ninth Circuit law, and U.S. Supreme Court authority is that,

16   while it is not necessary for the government to prove that

17   anyone actually lost money as a result of the alleged scheme,

18   you may consider evidence of such a loss in determining whether

19   the scheme existed.

20        THE COURT:  All I'm saying right now is I haven't

21   seen any evidence of loss.

22        MR. AVEIS:  Yes.  And the goal, in part, of the

23   chart, in addition, of course, to encapsulating these

24   voluminous records, is to introduce through the agent the

25   evidence of the loss as well as, for example, additional pieces

```
 1   of information about wires and specific amounts of loans rather
 2   than introduce all the voluminous documents.  Our goal in using
 3   1006 is to obviate the need to introduce any more paper than we
 4   already have and instead have the agent testify.
 5           THE COURT:  So the agent is going to testify as to
 6   the property status/loss as to each of the items in the --
 7           MR. AVEIS:  Correct, Your Honor.
 8           MR. MESEREAU:  We'll object to that, Your Honor.
 9           MR. BRAUN:  We object strongly.  That has to be
10   introduced with evidence that's competent, not her opinion
11   about what some other documents say.
12           MR. AVEIS:  Not correct.  1006 expressly states that
13   provided the information was produced and available in
14   discovery, which it was, the agent can, as a summary witness
15   under 1006, provide that summary, and the summary itself is the
16   admissible evidence, not the underlying documents.
17       The flip side is Rule 611a where it's just sort of a
18   summary that's provided where the underlying documents
19   themselves have been received.  It's up to the government to
20   elect.  It's in the Court's discretion to allow either.  And
21   we've elected 1006.  It's consistent with the practice that
22   we've routinely used, and it better encapsulates all the
23   evidence.
24           THE COURT:  All right.  Let me hear from counsel for
25   Mr. Patterson.
```

MR. MESEREAU:  Your Honor, the FBI agent is hardly a percipient witness to anything, let alone a property foreclosed and here's what the lender lost.  They've called -- they've called witnesses who -- on behalf of the lenders to testify to various facts.  This idea that we didn't want to get burdened by documents is absurd.

How could an FBI agent testify this foreclosed, this didn't foreclose, here's when it foreclosed, here's what the loss was.  It's highly unjust and will deny our client a fair trial.

THE COURT:  Any other parts of the chart?

MR. MESEREAU:  Yes, Your Honor.  Again, same objections that Mr. Braun raised we would raise on behalf of Mr. Patterson.

And, again, the last column where the agent is saying this foreclosed, here's what it sold for, the FBI agent doesn't know that.  The FBI agent obtains documents -- reviews documents like everyone else.  If trials could be conducted that way, there would be no need for percipient witnesses.  It's highly prejudicial to us, and they've had every opportunity to bring people in to prove what they want to prove.

We object to the charts as evidence.  We object to the charts --

THE COURT:  I'll give you a bite at that apple when we talk about -- after the government rests before we admit

1    everything as to whether or not they should be -- in addition

2    to being marked, actually be admitted and sent back to the

3    jury.

4              MR. MESEREAU:  Yes, Your Honor.  And, of course,

5    they've -- this is a chart for closing argument if a prosecutor

6    wants to put their spin on the evidence.  You have got

7    additional terms.  These aren't all the terms.  These are terms

8    that they want to selectively pull out and show a jury.  But

9    why do it through an FBI agent?

10        This is an argumentative chart.  This is not an objective

11   chart.  And it's certainly not evidence, I don't believe.

12             MR. AVEIS:  Your Honor, if I may --

13             THE COURT:  I'm not sure if Mr. Patterson's counsel

14   is done.

15             MR. MESEREAU:  You have escrow payouts.  They

16   haven't proven all of this.

17             THE COURT:  Which column?

18             MR. MESEREAU:  That would be the -- well, I

19   mentioned the property status loss.  There's escrow payouts

20   column --

21             THE COURT:  Oh, that's the same column.  I'm not

22   seeing what you are referring to, Mr. Mesereau.

23             MR. MESEREAU:  This is what I was given this

24   morning.  May I approach, Your Honor?  This is what I was given

25   this morning.  There's an escrow payouts column.

```
 1                THE COURT:  Oh, I see.  I gotcha.

 2                MR. MESEREAU:  Status loss column.  They selectively

 3     culled out terms.  They want to focus -- this is an

 4     argumentative chart.  It's for closing.

 5                THE COURT:  Anything else, Mr. Mesereau?

 6                MR. MESEREAU:  That would be it, Your Honor.

 7                MS. YU:  I'm sorry, Your Honor, if I may.  The real

 8     estate agent commission column is also inaccurate.

 9                THE COURT:  I can't hear you.

10                MS. YU:  I'm sorry, Your Honor.  The real estate

11     agent's commission column, which is the second column from the

12     last column, is also inaccurate because those amounts do not

13     correspond to the actual amount that Mr. Jason Patterson

14     received.  That went to the brokerage company, and then they

15     have to process the amount and then take out whatever fees are

16     owed to them.

17                And then also obviously the escrow payouts column does not

18     spell out everybody that got the money.  Then the amount column

19     also has various columns which the jury has not heard about

20     these various amounts that were being supposedly wired from one

21     destination to another.  So that's also quite confusing and

22     misleading.  And -- and when you look at various dates here

23     too, it doesn't really tell us anything other than Ms. Ebadi's

24     opinion about what the documents are saying.

25                And we've received in discovery in excess of close to
```

**UNITED STATES DISTRICT COURT**

 1   120,000 pages.  And I'm sure that some of these documents, if

 2   they want to introduce, they can pull out a page or two to

 3   substantiate and tell us where these numbers are coming from.

 4   We haven't heard any testimony on that, Your Honor.

 5          THE COURT:  Government?

 6          MR. AVEIS:  Sure.  So akin to the phone records,

 7   Your Honor, where Agent Ebadi testified about the meaning and

 8   identified specific phone records, it's the same thing here.

 9      And Counsel is right.  The government did produce over

10   120,000 pages of writings.  It's not just the voluminous

11   documents themselves, it's the content.

12      We have endeavored to be as objective and nonargumentative

13   as possible.  If you look at the entries, they are as benign

14   and vanilla flavored as they get.  The evidence in support of

15   nearly every box is already received at trial.

16      For example, the payouts are in the HUD-1s.  The amounts

17   of the commissions are in the HUD-1s.  Counsel is certainly

18   free to cross-examine the witness about the accuracy of the

19   entries or to add their own chart.  We've opened the door to

20   allow the use of charts.  If defense counsel wants their own

21   chart, we certainly wouldn't object, provided it has the same

22   kind of parameters.

23      And, additionally, I provided a draft of this two weeks

24   ago.  We are now on the eve of introducing it or less.  So it's

25   a bit of a surprise, and it somewhat hampers the government's

1    case.  I suppose the solution would be, if the Court does not

2    want to permit all the boxes, for example, relating to

3    foreclosure --

4            THE COURT:  I'm only concerned about the property

5    status/loss because that to me -- there are other factors that

6    come -- again, I'm not an expert.  But in my mind I'm thinking

7    that there might be other factors that determine if the loss

8    was greater or less than the amounts alleged.  And so it seems

9    the FBI is taking these documents -- and she may have

10   expertise.  I don't know.

11      But I'm not sure just by taking the foreclosure documents

12   and sale that this indicates -- it may be close.  It may be

13   accurate.  It may be less.  It may be more.  I don't know.

14           MR. AVEIS:  I see that point.  The agent, of course,

15   who would be subject to cross on that point, would talk about

16   the source of the documents and the material.  But all things

17   considered, I'm sensitive to that.  I think I'll make an

18   executive decision on behalf of our team that we'll strike that

19   column and would request that the rest of the chart be received

20   as we've requested.

21           THE COURT:  Okay.

22           MR. AVEIS:  So in terms of the go-forward aspect of

23   this, we have Agent Ebadi as our next on deck.  I think I could

24   probably get this over to my office, have that column removed,

25   and have it back so that it's available for her testimony.  I

1   may need an additional ten minutes or so to do that.

2          THE COURT:  All right.  The charts can be used with

3   the exception that the government needs to excise the column

4   property status/loss.

5      All right.  Anything else before we break and start in the

6   morning?  Anything else?

7          MS. YU:  No.  We also have an issue about witness

8   Timothy Lee.  Apparently he is coming in to testify about

9   Mr. Patterson's tax returns, and we've already communicated our

10  objection to the government about that.

11     There is -- we don't see any relevance whatsoever about

12  this particular witness to come in and talk about a 2007 tax

13  return apparently he doesn't even know much about.  He didn't

14  prepare them.  And the subsequent tax returns, I don't know

15  what -- I don't know what the relevance --

16         THE COURT:  What's the relevance of tax returns?

17         MR. AVEIS:  Sure.  Timothy Lee is a certified public

18  accountant.  In March of 2010, Mr. Patterson visited Mr. Lee

19  and asked Mr. Lee to prepare Mr. Patterson's '08 and '09

20  returns.  The '08 return was late.  The '09 return would be due

21  about a month later.

22     And in connection with that, Mr. Patterson made

23  representations about his residence, his properties, and what

24  have you.  Mr. Lee memorialized those in the tax returns.

25         Approximately five and a half months later in August of

**UNITED STATES DISTRICT COURT**

1    2010, Mr. Patterson sent a letter to Mr. Lee that contained

2    information about one of the two properties that are identified

3    as Counts 6 and 4 --

4            THE COURT:  I mean, do you need those?  I mean, are

5    you going to try to introduce the tax returns in total?

6            MR. AVEIS:  The tax returns have been marked

7    collectively with others, and no, we don't need to do all of

8    that.

9            THE COURT:  Yeah, but they might be fair game -- if

10   you are talking about the defendant's statements about -- I'm

11   assuming as it relates to those two counts, those properties,

12   his statements are fair game, but I don't see why you need the

13   whole tax returns.

14           MR. AVEIS:  The tax returns were, of course,

15   subscribed by, under penalty of perjury, the defendant, and he

16   made representations about certain deductions or exemptions or

17   items that are naturally reportable to the IRS, all of which go

18   to our case in chief proof.

19           And I can get into the detail if the Court wants, but I'm

20   willing to redact or not introduce parts of the return.  For

21   example, there's a schedule C about his profit and loss in

22   business or profession.  That doesn't need to come in.

23           But his residence address on page 1 of each return, that's

24   relevant.  The withholding -- excuse me.  The homeowner's

25   deductions for property mortgage payments on the property that

1     he lived in, 2220 Sea Ridge with Michael Murphy, that's

2     relevant, and we'll explain why through Mr. Lee and through

3     closing, of course.

4          And then there are -- there was an amended return that was

5     done where he captured the rental income that he had earned

6     from the 512 property and omitted a big chunk of that rental

7     income as well.  The fact that he did it after the fact as

8     opposed to the first meeting he had is relevant to the

9     government's case.

10         And the way he accounted for that rental income and

11    characterized that property in relation to the mortgage

12    interest deduction is also relevant.  We also have checks that

13    are out of his account that match that mortgage interest

14    deduction that will be part of the government's case as well.

15         But what I suggest we can do is we'll probably have a

16    break after Ms. Ebadi testifies and Robert Amenta testifies.  I

17    can confer with counsel, and we can pull out those pages that

18    are objectionable.

19             THE COURT:  I'm assuming everything is

20    objectionable.  But what I want the government to do then

21    during that break is -- I don't think everything should come in

22    as you conceded as well -- so to propose what you think is

23    necessary in terms of the government's case in chief, show that

24    to defense counsel so they can argue as to why that remaining

25    portion is not relevant.

```
 1              MR. AVEIS:  Very well.

 2              MS. YU:  Your Honor, as the Court pointed out, the

 3   two counts on One Third Place, 403 as well as 850, those two

 4   condo units, the only issue is whether Jason Patterson --

 5   Mr. Patterson intended to occupy, and we've already heard

 6   testimony on that.  We don't need to confuse the jury and make

 7   it unnecessary --

 8              THE COURT:  You are making an additional argument

 9   that it's cumulative?  I don't want to cut you off, but I just

10   want to make -- is my understanding correct?

11              MS. YU:  Yes, Your Honor.

12              THE COURT:  Okay.  All right.  Let's talk about it

13   during the break once everything has been presented.  I can

14   look at it and see whether or not we need it.

15              MR. BRAUN:  One other short point, Your Honor.  On

16   the jury instructions, I noticed this morning the scheme has

17   been generically defined.  The indictment has a specific

18   scheme.  So I just want to make that point now so Your Honor --

19              THE COURT:  I think that's the point she started to

20   make yesterday.

21              MR. BRAUN:  Right.  And I just noticed it was

22   reconfirmed because the indictment -- the jury instructions

23   don't -- does not define the scheme.

24              THE COURT:  Okay.  All right.

25              MR. ARKOW:  Your Honor, does the Court still have
```

**UNITED STATES DISTRICT COURT**

1    under advisement defendants' motions to introduce the expert

2    testimony?

3              THE COURT:  Yes.  I was going to anticipate we talk

4    about them after the government rests.

5              MR. ARKOW:  Okay.  Because the government would ask

6    for a proffer as the Court did --

7              THE COURT:  That's what I wanted.  I want to talk

8    about it after the government rests.  Maybe they don't intend

9    to introduce them.  I don't know.  So one, two, both, none of

10   them, and they can tell me what the proffer is.

11        All right.  I think I understand, but I just want to

12   confirm if my understanding is correct.

13             MS. YU:  If I may, along the lines of Mr. Harland's

14   point about the jury instructions, I went back and after

15   Mr. Mesereau signed the jury instructions yesterday during the

16   break and after court and I looked at the jury instructions,

17   the Ninth Circuit specifically has defendants, and then it

18   specifies the counts that they were charged with.

19        And so we would request that -- and we can confer with

20   counsel -- for bank fraud, loan fraud, and all the charged

21   counts, the jury instructions should have the counts that they

22   were charged with.  Otherwise, the jury is going to think that

23   Mr. Patterson or Mr. Tomich, for that matter, have committed

24   wire fraud, just blanket fraud all across.  So it would be very

25   confusing.  I think that we need to spell out which counts

```
 1   relate to wire fraud, which counts relate to bank fraud --
 2           THE COURT:  I think that's a great concept.  It
 3   seems like a concept that should be agreeable.
 4           MS. YU:  Yes, Your Honor.
 5           THE COURT:  So that's going to be helpful in terms
 6   of the verdict form --
 7           MS. YU:  Yes, Your Honor.
 8           THE COURT:  -- so they can have the instructions and
 9   remember what's what.  So I think that's a helpful idea.  I'm
10   not sure where it goes.  I'm not quite sure the instruction you
11   are talking about.  But, generally speaking, it's an agreeable
12   concept that the instructions should provide some type of
13   guidance to what applies to who.
14           MR. ARKOW:  The government intends to address that
15   by the verdict form, which will have some specificity as to
16   what the --
17           THE COURT:  I'm going to need -- so then I -- I
18   haven't seen them yet.  So if you can't agree, that's fine too.
19   But I want to be able to see the verdict form to make sure that
20   the jury instructions aren't confusing as to what applies to
21   who and that the verdict form doesn't become confusing because
22   there's no guidance.
23       Because the problem is going to be is I'm not sending the
24   indictment back to the jury room.  You are going to make your
25   arguments.  They're going to have -- the only thing they are
```

**UNITED STATES DISTRICT COURT**

```
1    going to have back there after you make your arguments are the
2    jury instructions.  And hopefully they'll remember what you've
3    told them about, you know, guilty or not guilty as to whatever
4    counts.  But I think there has to be something helpful to the
5    jurors back there.
6            MR. AVEIS:  One final thing, if I may.  So we marked
7    and requested it be received by reference the original file for
8    1000 East Ocean, No. 105.  It's right here.  Agent Mazon has
9    put that on the table here.  And I've spoken with your clerk
10   and request that the Court take custody of this original file.
11   It is actual IRS evidence.  And if that's okay, we'd like to
12   lodge it and have it kept until the end of the trial and then
13   released back to the government if that's okay.
14           THE COURT:  That's fine.
15           MR. AVEIS:  All right.  So may I have the record
16   show I'm going to hand this to your clerk.  This is the
17   original file from Vintage Escrow for Unit 105.  And I've now
18   handed this to the court clerk and ask that it be received, and
19   then we'll retain --
20           THE COURT:  What's the number?
21           MR. AVEIS:  This is Exhibit 2007.
22           MR. MESEREAU:  Your Honor, I may have missed
23   something.  If that's going to be introduced into evidence, why
24   do they retain it?
25           THE COURT:  It's being lodged with the Court.  They
```

UNITED STATES DISTRICT COURT

1     are not retaining it.  They are giving it back.

2              MR. MESEREAU:  Okay.  I'm sorry.  I misunderstood.

3     My mistake.

4              THE COURT:  Now, is there anything in that

5     entire -- I mean -- never mind.  That's fine.  All right.

6         Okay.  Let's take ten, and we'll start.

7              (A brief recess was taken.)

8              (Jury in at 9:51 A.M.)

9              THE COURT:  Good morning.

10             THE JURY:  Good morning.

11             THE COURT:  I apologize for the delay.  I hope you

12    understand we were working on the case while you were in the

13    deliberation room, and thank you for your patience.

14        You may proceed.

15             MR. AVEIS:  Thank you, Your Honor.

16                        SHERINE EBADI,

17    called as a witness by the government, was previously sworn and

18    testified as follows:

19                   DIRECT EXAMINATION (RESUMED)

20    BY MR. AVEIS:

21    Q    Agent Ebadi, last evening when we recessed for the day, we

22    ended with your testimony regarding highlighting or talking

23    about highlighted entries on Government's 2003 and 2004.

24             MR. AVEIS:  And at this time, Your Honor, I would

25    like to mark and ask that they be received as Government's

```
 1  2003A and 2004A.

 2           THE COURT:  Just give me one moment.  Say that

 3  again.

 4           MR. AVEIS:  Yes.  2003A being the highlighted

 5  version of 2003 and 2004A being the highlighted version of

 6  2004.

 7           THE COURT:  All right.

 8      (Exhibit Nos. 2003A and 2004A received into evidence.)

 9           MR. AVEIS:  Thank you.

10      All right.  At this time, Your Honor, pursuant to our

11  previous discussions, I'd like to have marked for

12  identification as Government's 2008 the one-page summary chart

13  printed on front and back relating to transactions involving

14  Defendant Patterson and as Government's 2009 the one-page

15  summary chart relating to transactions involving

16  Defendant Tomich.

17           THE COURT:  So marked.

18      (Exhibit Nos. 2008 and 2009 marked for identification.)

19           MR. AVEIS:  I've provided copies to counsel and the

20  Court.  And may I approach this witness with a version of that?

21           THE COURT:  You may.

22           MR. AVEIS:  Actually, I believe she may have brought

23  it to the stand with her.

24           THE WITNESS:  That's correct.

25  BY MR. AVEIS:
```

1    Q    Is that correct?

2    A    That's correct.

3    Q    Very good.  All right.

4         Ma'am, do you recognize this chart?

5    A    Yes.

6    Q    How do you recognize this chart?

7    A    I compiled it from information that I reviewed in

8    discovery.

9    Q    So let's talk about discovery.  What exactly is discovery?

10   A    Discovery -- I don't know the definition of it legally,

11   but when I'm referring to it, I'm referring to all the

12   documents that we obtained throughout the course of this

13   investigation, either voluntarily or via subpoena, some of them

14   being public records, some of them being defendants'

15   statements, things like that.

16   Q    So as an investigator in this case during the entire

17   course of investigation leading up until today, you've

18   collected documents from those various sources; is that right?

19   A    That's correct.

20   Q    Do you have a rough estimate of the total number of

21   documents or pages you've collected during the course of your

22   investigation of this matter?

23   A    I mean, we Bates numbered documents, and I think our Bates

24   numbering goes up to about 120,000 documents total.

25   Q    So what's Bates numbering mean?

1   A   We number the documents in discovery so that we can more

2   easily refer to them.

3   Q   Sequentially from 1 to 120-some odd thousand?

4   A   That's correct.

5   Q   And can you generally describe these documents that you've

6   obtained through your investigation?

7   A   Are you referring to what types of documents they are?

8   Q   Yes.

9   A   We have loan files.  We have escrow files, title records.

10  We have bank statements, phone records, documents from various

11  organizations like the California Association of Realtors.  We

12  have witness statements, defendant statements.  I don't know, a

13  whole lot of documents.

14  Q   Right.  So some of those documents might have one or two

15  entries and some may have multiple fine print small font

16  entries; is that accurate?

17  A   That's correct.

18  Q   So yesterday we looked at phone records, and are those a

19  sampling of the type of documents that you received in the

20  course of the investigation?

21  A   They are.

22  Q   All right.  And you also mentioned that you received bank

23  records.  Would those be, again, a sampling that might indicate

24  small entries, small numbers, small line items?

25  A   Correct, yes.

1    Q     And in terms of, for example, the escrow files, you are

2    familiar with the escrow file for the transaction called

3    1000 East Ocean, No. 105?

4    A     Yes.

5           MR. AVEIS:  I believe we've had that received and

6    it's been lodged with the Court.  If I can ask the clerk to

7    hand that to the witness.

8           THE COURT:  You may.

9           MR. AVEIS:  Thank you.  So the clerk having handed

10   that to the witness.

11   BY MR. AVEIS:

12   Q     Agent Ebadi, are you familiar with this escrow file?

13   A     I am.

14   Q     Are you familiar with escrow files similar to it that

15   relate to the other several transactions that we've talked

16   about during the course of this case?

17   A     Yes, I am.

18   Q     And is it a fair statement that the escrow files typically

19   contain several hundred documents at times that relate to the

20   transaction?

21   A     Typically.

22   Q     And each of those documents may contain one or more, if

23   not dozens or hundreds, of entries relating to pieces of

24   information that relate to the deal?

25   A     That's correct.

1    Q    And looking now at what's been marked as --

2              MR. AVEIS:  Before I get to that, if the clerk

3    wouldn't mind retrieving that from the witness so we have a

4    little room at the witness stand.

5    BY MR. AVEIS:

6    Q    Let's turn to what's been identified as Government's

7    Exhibit 2008 and 2009, this summary chart.

8         So can you just generally indicate whether the entries

9    made in this summary chart are based upon your review of some

10   or all of those 120-some odd thousand documents that have been

11   collected in this case?

12   A    Yes.  The information in this chart is directly from those

13   documents.

14   Q    All right.  So this chart has several columns, property

15   listing, RPA.  Does RPA mean the residential purchase

16   agreement?

17   A    It does.

18   Q    With the same sort of abbreviation I've used throughout

19   the testimony here?

20   A    Yes.

21   Q    And then there are additional headings for loans, wires,

22   and escrow payouts.  Below that are subheadings.  Could you

23   describe those subheadings.

24   A    So the initial one is the property address.  The second

25   one that says "Agent" refers to either the listing and/or the

buyer's agent.  Sometimes it's the same person.  So that's why there may only be one entry.

The "Price at RPA," I refer to that as the list price or the asking price, the initial price the seller was asking for the property.  The next column says "Price," and that would be what I call the offer price or sometimes it's the price on the RPA.

Then there's "Dates."  Specifically that's referring to the date of the offer.  "Buyer" would be the name of the buyer on the offer or on the RPA.  The "Seller" is the name of the seller.  "Additional terms" refers to terminology either listed in the RPA or in some other document that referred to what we call the cash back or -- I'm not sure what we are supposed to call it, but I call it the cash back or the money going back to Allen Dana from escrow.

"COE" means close of escrow, and that's the date that escrow closed.  "Lender" is the entity that loaned the money for the purchase of the property.  "Amount" is the amount of the loans that were used to purchase the property.

"Date," this date refers to the date that the money was wired, and I think I only did that for the counts that are wire fraud counts.  The "From" and "To" is the location of the sending wire and the location of the person that received the wire or the entity that received the wire.

"Amount" is the amount of the wires that were wired,

1    because sometimes it's slightly different from the loan amount.

2    And the "Escrow Payouts" are the cash back that was paid out of

3    escrow and to whom it was paid and in what amount.  And the "RE

4    Commission" is the amount that was received by the real estate

5    agents in the form of their commission.

6    Q    All right.  So is it a fair statement that the entries in

7    these several boxes on Government's Exhibit 2008 and 9 were

8    pulled from the entries on one or more of the 120-some odd

9    thousand pages of documents that themselves contained sometimes

10   hundreds of entries?

11   A    Yes.

12        MR. AVEIS:  All right.  Your Honor, the government

13   would request that 2008 and 9 be displayed to the jury at this

14   time so that the witness can discuss that.

15        THE COURT:  They may.

16        MR. AVEIS:  Thank you.  Your Honor, for ease in

17   handling, I have a separate copy for each juror, and I would

18   request that I can distribute these to the jurors.  This is the

19   same version that the defense has.

20        THE COURT:  If you would give the copies to

21   Ms. Hernandez, and she will distribute.

22        MR. AVEIS:  Very well.  Thank you.

23        THE COURT:  Ladies and gentlemen, you are going to

24   be given copies of the charts.  You are not going to be able to

25   keep the charts.  They're just so you that can see the charts

1   as they're discussed.  So don't write on the charts because

2   they're going to be returned back to the court.

3            MR. AVEIS:  So for the record, this is a two-page

4   document and so the clerk makes sure that each juror gets two

5   pages.

6            THE WITNESS:  It's actually three pages.  On the

7   back of the front page, there's some information.

8            MR. AVEIS:  Exactly.  We've double sided the first.

9   That's right.

10           THE COURT:  You may proceed.

11           MR. AVEIS:  All right.  Thank you.

12   BY MR. AVEIS:

13   Q    So, Agent Ebadi, let's look at the chart that each of the

14   jurors now has.

15        And in the first row under "Property," it has 1000 East

16   Ocean, No. 409.  What transaction was that?

17   A    This transaction didn't close, but it was an offer that

18   was presented by Jason Patterson to Scott Kato who was

19   representing the seller.

20   Q    In the columns "Loans, Wires, and Escrow Payouts," it's in

21   all gray.  Can you explain why that's all gray.

22   A    This never opened escrow.  Therefore, there was no close

23   of escrow, no lender, no wire, and no escrow payout.

24   Q    All right.  So earlier in your testimony, you talked

25   about -- and again relating to that same transaction,

1   1000 East Ocean, No. 409 -- that this transaction involved a

2   deal that did not close, and you talked about the price at RPA.

3   That's the listing price, and then there was an asking -- I'm

4   sorry -- a selling price.  Those are those two columns.  Do you

5   see those?

6   A     Yeah.  The asking price and the offer price?

7   Q     Okay.  And where did you derive the information that's

8   under buyer and seller?

9   A     I got the buyer information from the offer or the RPA and

10  the seller information from a couple different sources, from

11  speaking with the listing agent, which was Scott Kato.  And

12  also on the listing agreement, you can pull up title records

13  for this, and I saw that they were the seller or the owner at

14  this time.

15  Q     And for the record, that was the name Garakian?

16  A     Correct.

17  Q     Under "Additional terms," what's the source of that

18  information?

19  A     That was written on the RPA.  I believe it was on page 6,

20  but I'd have to look at it to be sure.

21  Q     Let's look at the second row which is 1500 East Ocean,

22  No. 609.  Under "Listing," where did you derive that

23  information?

24  A     The listing agent was Jason Patterson.  We received that

25  information from the seller, Edward Perry, in a listing

1    agreement he had and I think some e-mails with Mr. Patterson.

2    Q    The price at RPA and the price, those were the listing and

3    purchase prices respectively; is that right?

4    A    The listing price and, yes, the offer price or the

5    ultimate purchase price, yes.

6    Q    Continuing on, we have a date.  Is that the RPA date the

7    contract mentions that Jose Ramirez was the purported buyer?

8    A    That's correct.

9    Q    Moving along, there's a quoted section under "Additional

10   terms."  What was the source of that information?

11   A    That also came from the RPA.

12   Q    And we have "COE."  That is the close of escrow date,

13   lender, and amount.  What do those figures represent?

14   A    The COE is the close of escrow that's listed on the escrow

15   documents.  I believe it's on the HUD-1.  And the lender being

16   Washington Mutual, we get that from a number of sources to

17   include the trust deed and the HUD-1.  The amount of loans,

18   again, from the HUD-1 and from the trust deeds.

19   Q    And moving along, there are three gray columns there.  Why

20   are those included on the row that relates to 1500 East Ocean,

21   No. 609?

22   A    This was not a wire fraud count.  So the wires, I didn't

23   include that information here.

24   Q    This is a bank fraud count or a loan -- false statement to

25   a lender count that involves WAMU, the federal insured lender.

1   Is that why you didn't do that?

2   A     That's correct.

3   Q     Moving along under "Escrow payouts," it says,

4   "Fredy Torres, 50,000," and then there's another column there

5   with real estate commissions.  Can you explain the source of

6   your entries.

7   A     The escrow payout of 50,000, I received that information

8   from the escrow file.  It's listed in a couple of different

9   areas.  I believe this particular escrow company had a receipts

10  and disbursement sheet plus checks that were paid out, the

11  copies of the checks that were paid out.

12        And then the real estate commission, I also received that

13  from the escrow file.  And when I calculated the real estate

14  commission, to the best that I was able to, I subtracted out

15  any money that was paid to the agent's brokers or to their

16  national associations.

17  Q     Was the source of the real estate commissions generally

18  the HUD-1s for the related transactions?

19  A     The HUD-1 usually states the entire amount paid to the

20  real estate brokerage.  So that doesn't mean that all of that

21  goes to the agent.  But when you look at the escrow file, like

22  I said, either on the receipts and disbursements page or on the

23  copies of checks, you'll see the breakdown typically of how

24  much goes to the brokerage and how much goes to the agent.

25  Q     Very good.  On the third row, 850 East Ocean, 711, was

1    your methodology the same in terms of getting the information

2    from the raw documents regarding who the listing agent was,

3    Patterson, what the price and the listing at RPA was, and what

4    the offer price was?

5    A    You know, I think for this property I obtained the listing

6    price from the MLS records and not from a listing agreement.  I

7    don't remember having a listing agreement for this particular

8    transaction.

9    Q    What are MLS records?

10   A    MLS is the Multiple Listing Service.  It's an online, I

11   guess, database, you could call it, that real estate agents use

12   to list properties either for sale or for lease.  And you

13   can -- I had access to the MLS at that time.  So I could pull

14   up properties and look at the history of when entries were made

15   by agents of a certain property at a certain price on what date

16   and when those entries were changed and by whom.  And I believe

17   that I got that information from the MLS.

18   Q    Moving along, we have the buyer and seller as Ramirez and

19   Kuske respectively and then language that relates to the

20   purported consulting fee.  What was the source of that

21   information?

22   A    That was actually an addendum to the purchase agreement.

23   It wasn't in the body of the first eight pages.  It was in an

24   addendum page.

25   Q    Moving along, under "Loans," would your answers be the

1    same as the prior entry in terms of the source of that

2    information?

3    A      Yes.

4    Q      Okay.  Now, moving along, there are three gray boxes

5    there.  We'll talk about that in a minute.

6         Let's move to escrow payouts and commissions.  Would the

7    source of that information be the same as the two prior boxes

8    about where you learned about the payment to Fredy Torres and

9    then the payments to the realtor?

10   A      That's correct.

11   Q      Moving to 1000 East Ocean, 105, would your answers be the

12   same in regard to the listing and identity of the agent that

13   had the listing?

14   A      Again, the price at RPA or the listing price, I obtained

15   that from the MLS and not from a listing agreement.  And the

16   rest of the information you just asked about would be the same

17   answers.

18   Q      And then we move along to the information relating to the

19   RPA, did you derive that information from the purchase

20   agreement?

21   A      Which information are you talking about?

22   Q      I'm sorry.  Under 1000 East Ocean, 105, the price, date,

23   buyer, and seller.

24   A      Yes.  The price of the offer, 1.325, the date of the

25   offer, and the buyer and seller information, that's correct.

1           MR. AVEIS:  All right.  If Your Honor wouldn't mind,

2    I'd like to put 169A up on the easel.

3           THE COURT:  You may.

4           MR. AVEIS:  Thank you.

5    BY MR. AVEIS:

6    Q    So, Agent Ebadi, directing your attention to what's been

7    received and talked about during the case as 169A, you

8    indicated 184,562.50 in this column for additional terms.  Why

9    is that entry there?

10   A    That's what the additional terms were.  I mean, initially

11   this amount was in a payment authorization form until the

12   lender requested an invoice, and then it was put into this

13   invoice that's up on the easel.  And then that's the amount

14   that was actually paid out of escrow to So Cal Customs.

15   Q    All right.  Moving along, we have the loans.  We have

16   close of escrow date of 10/19/06 and a lender Silver State

17   Mortgage and the amounts.  Do those entries match the identity

18   of that particular lender and the amounts of the loans that

19   were disbursed or funded for this transaction?

20   A    They do.

21   Q    And then "Wires," would you explain those entries in those

22   three columns in that same row.

23   A    Yes.  So when a real estate transaction is funded, the

24   money goes from the lender to the title company.  And that

25   typically happens -- that has to happen prior to close of

1    escrow because escrow can't close without the money coming in.

2        So the lender will wire money from whatever bank they bank

3    at to whatever bank the title company banks at.  And then the

4    title company will pay off any recorded liens against the

5    property or against the seller and then wire the rest of the

6    money to the escrow company.

7        So the wires you are seeing in these columns, the 993750

8    and the 331250 were wires that were wired from Silver State

9    Mortgage to the escrow company which was -- sorry -- to the

10   title company on this particular deal.  And they were wired on

11   10/18/06.

12       And based upon information we received from the Federal

13   Reserve and also from the wire sheets that are in the title

14   file and sometimes in the loan file, we were able to determine

15   the location of where they were wired from and where they were

16   wired to.

17   Q    What do those entries, from and to, represent in

18   particular as to this transaction?

19   A    WA means Washington and MI is Michigan, I believe.

20   Q    So would it be a fair statement that the wires originated

21   in Washington and ended up in Michigan?

22   A    That's correct.

23   Q    And that would apply to each of those two entries on the

24   column relating to 1000 East Ocean, No. 105?

25   A    That's correct.

Q    And then continuing on, of course, the information for

escrow payments, you've described the payouts and then the

commission information.  Would your information -- excuse me.

Would your testimony about the column relating to real estate

commission for that transaction be generally the same as to the

source of that information?

A    Correct.

Q    Okay.  Moving to 1000 East Ocean, 415, the last column on

the first page, last row on the first page, would your answers

be generally the same in regard to the source of the

information for the listing?

A    This one wasn't listed in the MLS.  So I received the

listing price from a listing agreement that the seller

provided.  And then, when you look at price under RPA, the

million four fifty, that says "rejected."  I obtained that

information from an RPA that the seller provided that they

received from Jason Patterson.

     And then underneath that it says a million one fifty,

Sudol to Dana.  That's from a purchase agreement from Mr. Dana

to the sellers, the Sudols.  And under that, it says,

"1,400,000 from Dana to Olague."  That is from a purchase

agreement.  I believe I obtained that one from the escrow file

between Dana and Olague.

Q    The column RPA price that has the initial entry of one

million, 450, rejected, did that correspond to the testimony of

UNITED STATES DISTRICT COURT

1    Courtney Sudol the other day where she described that as fishy,

2    I believe?

3    A     It did.

4    Q     Moving on to the date --

5             MR. MESEREAU:  Object to the question.  It's

6    argumentative.  Move to strike.

7             THE COURT:  Overruled.

8    BY MR. AVEIS:

9    Q    "Date," "Buyer," and "Seller."  Can you explain the

10   entries under the "Date" column?

11   A    So the date 11/11/06, and then in parentheses, it says,

12   "Rejected offer from MO."  MO is my abbreviation for

13   Margarita Olague.  That's how I pronounce her name.  I don't

14   know if that's correct.

15        11/11/06 was the date of the rejected offer at a million

16   four hundred fifty thousand, and I obtained that from a copy of

17   the RPA that the Sudols provided.

18   Q    Under "Buyer" there are two buyers.  Can you explain why

19   you have two buyers under that column.

20   A    This was the double escrow.  So there were actually two

21   sellers and two buyers, the Sudols being the original sellers,

22   and then Allen Dana and Margarita Olague both purchased this

23   property simultaneously I guess is the best way to describe it.

24   I mean, technically what happens is Olague purchases the

25   property from Dana --

```
 1              MR. MESEREAU:  I'm going to object as argumentative.
 2              THE COURT:  Overruled.
 3              THE WITNESS:  -- and then Dana uses the funds from
 4    Margarita Olague's loan to purchase the property from the
 5    Sudols.
 6    BY MR. AVEIS:
 7    Q    Under "Additional terms," what is the source of the
 8    information contained in that column?
 9    A    The first part of it, it says "in MOs," meaning
10    Margarita Olague's rejected offer.  Then in parentheses,
11    "Seller agrees to a gross sales price of a million one fifty,
12    and seller to authorize payment and/or credits towards cost to
13    So Cal Customs/buyer through escrow for any difference between
14    the appraised value and a million on fifty...  The 3 percent
15    credit through the RPA-CA dated 11/11/06 will be deducted from
16    this overage."
17         That came from an addendum that was attached to the
18    rejected RPA that the Sudols provided.
19    Q    Moving along to the loans column, we have Silver State
20    Mortgage, a date of close of escrow, and two loan entries.
21    Were those the gross proceeds from the funded loans?
22    A    By gross proceeds, you mean that was the amount that the
23    lender lent?
24    Q    Yes.
25    A    Yes.
```

```
 1   Q     And then we have under "Wires" the three entries with the
 2   amounts.  And under the "from" and "to" column, do those,
 3   similar to your prior testimony, indicate the money flowed from
 4   Washington through the Federal Reserve to Michigan and then
 5   from Michigan through the Federal Reserve to Minnesota?  Is
 6   that accurate?
 7   A     The first two wires are the funding wire.  The third one
 8   listed there is the wire from title to escrow.
 9   Q     All right.  And did I correctly describe the flow through
10   those states?
11   A     You did.
12   Q     And then in the payouts, you -- can you describe why you
13   wrote the leg descriptions?
14   A     So the $128,000 and change goes to Mr. Dana.  So how do I
15   explain this?  When the money comes in for Ms. Olague's loan,
16   it goes -- it first has to pay off the liens that the Sudols
17   have against the property.  So that happens in title.
18         Once those liens are paid off, the money goes to escrow,
19   specifically Quick Escrow, and Quick Escrow pays the Sudols the
20   remaining amount of their proceeds less 34,500 that is
21   attributed to Ms. Olague's closing costs.
22         And then, I believe, the 128,000 is what's left after all
23   these payouts happen.  That money eventually goes to Dana.
24   Q     And what is the 34,500?
25   A     It's actually Ms. Olague's closing costs.  There may be a
```

**UNITED STATES DISTRICT COURT**

```
 1   small percent of it that is Dana's closing costs.  But because
 2   he didn't have a loan, his closing costs would be extremely
 3   minimal.  They would be escrow and title fees, possibly a
 4   couple of things.  But I'd have to look at the HUD-1.  The bulk
 5   of the closing costs come from Margarita Olague's loan.
 6   Q    So there was no loan obtained by Dana to get the property
 7   in the first place?
 8   A    That's correct.
 9   Q    Real estate commission, what is the source of that
10   information?
11   A    The escrow file.
12   Q    The next and last transaction relating to
13   Defendant Patterson, 1700 -- excuse me -- 700 East Ocean, No.
14   1606, what was the source of your information relating to the
15   listing?
16   A    The price at RPA or the listing, I got that information
17   from a few different sources.  From the MLS, it showed that
18   Mr. Patterson was the agent that was listing the property.  And
19   also the seller provided us with -- I don't think we had a
20   listing agreement on this one, but we may have.  But we spoke
21   to the seller, and he told us that Patterson was his
22   real estate agent.
23   Q    Moving along to the RPA information, what is the source of
24   the information relating to those four column entries?
25   A    That information, the first column, that's price at RPA, I
```

1    obtained that from the MLS.  We noticed that the price was

2    initially listed at 815.  And by the time the offer comes in,

3    the price had been reduced to 667,777.

4        And then the price -- in the next column, the initial

5    offer that comes is at 830,000.  It then gets reduced to

6    815,000 at some point during the escrow process.  And

7    eventually the sales price is 815,000 based upon the HUD-1.

8        And date, the first date is the initial offer that

9    Mr. Bryan received from Jason Patterson on behalf of -- I think

10   the buyer column actually says Heleodoro Olague or assignee.

11   And then the second date is the second RPA that Mr. Bryan

12   received from Mr. Patterson with just the name of

13   Margarita Olague.  That's what M. Olague stands for.

14   Q    Under "Additional terms," there's an entry very similar to

15   the entry on the preceding page.  What was the source of the

16   information that you obtained to make this entry?

17   A    Mr. Bryan, the seller, provided us with the initial RPA

18   that Mr. Patterson gave him on behalf of Heleodoro Olague or

19   assignee, and in the addendum of that RPA, there is this

20   language that is similar to the 415 transaction.

21   Q    Moving along to the loans, would your answers be generally

22   the same with regard to the source of the information about

23   close of escrow, lender, and amount; that is, from the escrow

24   or title files?

25   A    That's correct.

1   Q     And regarding the wires, would your answers be the same in

2   regard to the source and destination of the wires,

3   New Jersey-Michigan, New Jersey-Michigan, and then

4   Michigan-Minnesota?

5   A     That's correct.

6   Q     And the amounts for the columns under "Loan amount" and

7   then "Wire amount," again, were those derived from, among other

8   sources, the Federal Reserve wire information?

9   A     The loan amount was not obtained from the Federal Reserve.

10  That was obtained from the loan file and/or escrow file.  And

11  the wire amount, we had that information prior to obtaining it

12  from the Federal Reserve.  But their documents did confirm

13  those amounts.

14  Q     Under "Escrow payout, 119,000," was that source, among

15  other sources, the promissory note that's been received in

16  evidence in this case?

17  A     There was a promissory note, yes.  And then there was also

18  a check out of escrow for that amount.

19  Q     That matched the promissory note of $119,000?

20  A     That's correct.

21  Q     And then the real estate commission, what was the source

22  of that information?

23  A     The escrow file.

24  Q     Moving along to the next page which relates to the

25  transactions involving Defendant Tomich, would your answers be

**UNITED STATES DISTRICT COURT**

```
 1    the same regarding the source of the information for the agent
 2    and listing -- or price at RPA, rather?
 3    A    Yes.
 4    Q    And as far as RPA is concerned, what's the source of the
 5    information in those four columns, price, date, buyer, and
 6    seller?
 7    A    So we have the RPA that was provided to the Harborths from
 8    Mr. Tomich on behalf of -- I believe initially it was Allen
 9    Dana or Esther Dana, but that escrow canceled, and then the
10    buyer became Lucila Castro.  So the one listed here, I think I
11    only listed the Castro RPA here.  And it was at a million
12    two fifty was the price she was offering, the date being
13    11/12/05, and her name listed as the buyer.
14    Q    Under "Additional terms," can you tell us the source of
15    that information.
16    A    I think in this one it was not written -- it may have been
17    written into the initial RPA between -- the one from
18    Allen Dana.  But in this particular RPA for Lucila Castro, that
19    information was not in the RPA.  It came from a couple
20    different sources, one of them being a letter from Mr. Tomich
21    to the escrow company when the Dana escrow canceled explaining
22    where the money needed to go and who needed to be paid what.
23         And then also there was an amendment to escrow
24    instructions which essentially, if terms change after the RPA
25    and -- has been provided and escrow has been opened, my
```

**UNITED STATES DISTRICT COURT**

1    understanding is that they do an amendment to escrow

2    instructions to change those terms.  We find that in this

3    escrow file, and it says compensation to Fredy Torres for

4    50,000, et cetera, et cetera.

5    Q    The loans columns, they relate to the close of escrow,

6    lender, and amounts, did you obtain that information from the

7    title, escrow and/or lender files?

8    A    Yes.

9    Q    And WAMU there, is that Washington Mutual, the federally

10   insured lender?

11   A    It is.

12   Q    The wire boxes are grayed out.  Is that because the wires

13   were not relevant to these counts?

14   A    That's correct.

15   Q    Moving to escrow payouts, Fredy Torres, can you explain

16   why it's 56,000 and 20,000 from Tomich and the source of that

17   information.

18   A    The source of the information is the escrow file.  The

19   reason why it's 56 -- I'm not entirely sure why it changed from

20   50 to 56.  But we find that Fredy, indeed, did receive $56,000

21   for what they deemed a referral fee, and we see that on the

22   escrow instructions, I believe, and also the receipts and

23   disbursements page and then a check to Mr. Torres.

24        The 20,000 is separate from that, and it was reduced from

25   Mr. Tomich's commission and given to Fredy Torres per

1    Mr. Tomich's instructions and also per an amendment to escrow

2    instructions.

3    Q    Turning to the next transaction, 1000 East Ocean, 609,

4    let's jump right to the section that is grayed out.  Can you

5    explain why those entries are made or not made?

6    A    Again, this never opened escrow.  The seller refused the

7    offer at the onset.  So there was no close of escrow,

8    et cetera.

9    Q    So let's turn to the first few boxes of that transaction.

10   Does this relate to the testimony of Mr. Kato -- or Kato,

11   rather, that he talked about and that was early on in the

12   transactions?

13   A    Yes, it does.

14   Q    All right.  Did you derive the entries from the purchase

15   agreement that you obtained in this case?

16   A    Yes.  Mr. Kato provided us with a number of documents, the

17   purchase agreement being one of them.

18   Q    Okay.  Can you explain the "Additional terms" column

19   there.

20   A    There was a letter from Mr. Tomich to Mr. Kato, sort of a

21   cover letter I guess you can call it, that referenced 125,000

22   going to the buyer.  And then, in addition, in the RPA there

23   was language that is quoted here, "The seller to credit buyer

24   125,000 towards closing costs and consultation fees at the

25   close of escrow."

1    Q     And this transaction did not close?

2    A     It did not.

3    Q     The second to last transaction on the chart, 1000 East

4    Ocean, No. 714, can you explain the entries starting from

5    listing.

6    A     Yes.  When I look at the MLS and also -- I'm not entirely

7    sure I have a listing agreement for this property.  From the

8    MLS you can tell that Mr. Tomich listed this property.  And

9    then also we have the RPA and other documents that show he sold

10   the property.

11         When I look at the MLS for this property, they had -- the

12   seller, Ms. Jackson, had previously listed the property with

13   another agent.  And 989 -- or 989,000 was the listing price

14   that it was at just prior to Mr. Tomich taking the listing.

15   Q     The entries that relate to the 250 payment at close of

16   escrow to SEC, can you elaborate on that, the source of that

17   entry.

18   A     Yeah.  The source of that is from an escrow document or

19   document we received from the escrow file.  Specifically, it

20   was -- I don't know if it was called payment authorization, but

21   essentially it was a document sent to the seller so that the

22   seller could authorize payment of 250,000 to So Cal Customs

23   from her proceeds.

24   Q     Moving along under "Loans and Wires," would your answers

25   generally be the same, that the lender, Silver State Mortgage,

```
 1    wired funds through Washington and Michigan, Washington and
 2    Michigan, and Washington and Minnesota as indicated under the
 3    wire from/to column?
 4    A    The Washington-Minnesota wire doesn't come from Silver
 5    State.  It comes from the title to escrow.  But otherwise, yes.
 6    Q    Right.  And, again, those are interstate wires through the
 7    Federal Reserve?
 8    A    Correct.
 9    Q    And escrow payouts, the 250, is that consistent with the
10    information you obtained relating to the authorization signed
11    by Yolanda Jackson that you talked about?
12    A    Yeah.  We see in the escrow file on the receipts and
13    disbursements page and then also a check.
14    Q    And the 41,850 commission, what's the source of that
15    information?
16    A    The escrow file.
17    Q    Finally, 1000 East Ocean, 610, can you explain the listing
18    entries there, please.
19    A    Yes.  We have, again, MLS records showing that Mr. Tomich
20    was listing this property.  The listing period technically in
21    the MLS is actually different from when the second offer was
22    received.  Mr. Tomich had this listing sometime around the end
23    of the summer of 2006 until the fall of 2006 when the listing
24    expired.  A few months later is when the second offer comes in
25    from Allen Dana.
```

1        But during the initial listing period is when the Baratas

2   receive an offer from Mr. Tomich on behalf of a buyer.  And we

3   don't have a copy of that RPA.  We only have a verbal offer

4   that I know of.  And that offer was for more than the asking

5   price with a condition that cash back be given, but they

6   rejected it.

7        Their listing terminated.  They refinanced their property.

8   And then we see another listing in the MLS from Mr. Tomich.

9   And that's when the second offer comes in from Allen Dana.  And

10  then there's simultaneously an RPA between Allen Dana and

11  Margarita Olague.

12  Q    And where we move through the additional terms, "Double

13  escrow," did you mean to describe that there were these two

14  escrows that you just talked about between Barata/Dana and then

15  Dana/Olague?

16  A    That's correct.

17  Q    Moving along to the entries under "Loans," would your

18  testimony generally be the same, that American Home Mortgage

19  was the lender, those are the amounts of the loans, and then

20  the wires to and from and other entries relate to the transit

21  of the money from New Jersey to Michigan.  That relates --

22  through the Federal Reserve, that relates to the interstate

23  aspect of the money flow?

24  A    That's correct.

25  Q    Then moving along to the final entries on the chart, can

```
1    you explain the escrow payouts and then the real estate
2    commission numbers.
3    A    So similarly to the 415 transaction, when
4    Margarita Olague's loan funds, the money goes to the title
5    company.  The title company pays off whatever liens are against
6    the property, those liens would be in Mr. and Mrs. Barata's
7    names, and whatever other recorded liens there are.  The money
8    then goes to escrow and is -- some of it is used to give the
9    Baratas the rest of their proceeds, minus the 34,500 of closing
10   costs.  And then the remainder goes to the Kiet & Associates
11   trust account, some of which goes to then Dana.
12   Q    All right.  Very well.  Let me turn to another area.
13             MR. AVEIS:  At this time, Your Honor, I intend to
14   ask the witness questions about her interviews of Mr. Tomich,
15   and I would request that the Court -- and I would indicate for
16   the benefit of the Court and the jury that we do not intend
17   that this evidence be introduced against Mr. Patterson.
18             THE COURT:  All right.
19   BY MR. AVEIS:
20   Q    So, Agent Ebadi, at some point did you interview
21   Defendant Ronald Tomich?
22   A    Yes.
23   Q    How many times did you interview him?
24   A    I believe four.
25   Q    Do you recall where the first interview occurred?
```

**UNITED STATES DISTRICT COURT**

1  A    At my old office which is in downtown Long Beach in the

2  Trade Center Building.

3  Q    How did that interview come about?

4  A    I think we called Mr. Tomich and asked him if he would

5  come in and talk to us, and he came in.

6  Q    Do you recall the date of that interview?

7  A    My independent recollection, no.  In 2010, end of 2010.

8  Q    Would looking at -- did you do a report of that interview?

9  A    I did not write the report, but I did review the report

10 and sign it, yes.

11 Q    Let's talk about that.  Was a report of that interview

12 done?

13 A    Yes.

14 Q    Who wrote that report?

15 A    Special Agent Mazon of the IRS.

16 Q    That's Special Agent Mazon in our courtroom here?

17 A    That is.

18 Q    And did she share responsibility with you to attend that

19 interview?

20 A    Correct.

21 Q    Did you take notes of that interview or did she?

22 A    I don't remember who took notes.  I'd have to look at the

23 notes.  But generally she took notes because her writing is

24 much better than mine.

25 Q    Did you review her notes along with preparing for today or

1    at least review the reports, rather?

2    A      I reviewed the report, yes.

3    Q      And did the reports reflect your best recollection of what

4    Mr. Tomich said during that interview?

5    A      They did.

6              THE COURT:  I'm sorry.  Could I have a sidebar with

7    counsel?

8              MR. AVEIS:  Yes.

9                  (The following was held at sidebar

10                 outside the presence of the jury.)

11             THE COURT:  Based on the argument that Mr. Braun is

12   going to make, it might be helpful to me if I had the reports

13   with me so I could see the context as it flows so I could

14   understand what Mr. Braun is going to argue today.  Do you have

15   extra copies?

16             MR. AVEIS:  We filed a witness statement --

17             THE COURT:  I looked in there.

18             MR. BRAUN:  Might I also indicate there are 46

19   paragraphs in one report.  You may want to refer to which

20   paragraph.

21             THE COURT:  I may have missed it.  I went back there

22   and I looked, and there were two stacks this large.  I couldn't

23   find them.

24             MR. AVEIS:  I'm going to defer to my partners on

25   that.  Did we not include those?

 1          THE COURT:  I didn't see in there the defendants'

 2   statements.  I saw the witness statements.  But I didn't see

 3   the defendants' statements.

 4          MR. AVEIS:  If I can get 15 minutes to go back and

 5   get them so that we can copy them for the Court, it might be

 6   helpful because I don't think we have them.

 7          THE COURT:  It's going to be helpful to the defense

 8   when you get up, and I'm not going to understand what you are

 9   talking about.  All right.  So let's do that.

10          MR. AVEIS:  We don't have a clean version handy.

11          THE COURT:  Okay.  All right.  Thank you.

12               (End of sidebar discussion.)

13          THE COURT:  We are going to have to take an

14   unscheduled break and place the blame on me.  But I just want

15   to assure you that we are proceeding at a pace that's much

16   quicker than we anticipated.  So we expect -- we anticipate

17   that the government will rest today.  And so it doesn't mean

18   that we are necessarily done, but it means that the

19   government's case in chief will be completed today.  That's

20   what we anticipate.  That's our goal.

21      In any event, we are on a break for about 15 or 20 minutes

22   for my benefit, and then we'll resume again.  Please remember

23   not to discuss this case among yourselves or with anyone else.

24   Don't form or express any opinions about the case until it's

25   finally submitted to you.

**UNITED STATES DISTRICT COURT**

```
1              THE CLERK:  All rise.

2              THE COURT:  Leave those on the chairs, please,

3    referring to the charts.

4              (Jury out at 10:38 A.M.)

5              THE COURT:  I apologize.  When this issue came up, I

6    went back to go look to see if I had the statements, and I

7    couldn't find them.  I meant to come back and say I need the

8    statements.  So anyway, if I could have the statements that

9    you -- as well as Mr. Patterson, because there may be an

10   additional argument as it relates to Mr. Patterson.

11             MR. AVEIS:  Yes, Your Honor, of course.

12             (A brief recess was taken.)

13             (Jury in at 11:18 A.M.)

14             MR. AVEIS:  Your Honor, with the permission of the

15   Court and having conferred with counsel, the parties have

16   agreed that the government can call these two witnesses out of

17   order, and we would request to now call Robert Amenta.

18             THE COURT:  You may.

19             MR. AVEIS:  A-m-e-n-t-a.

20             THE CLERK:  Please raise your right hand.  Do you

21   solemnly swear the testimony you shall give in the cause now

22   pending before this Court shall be the truth, the whole truth,

23   and nothing but the truth, so help you God?

24             THE WITNESS:  Yes.

25             THE CLERK:  Thank you.  Please take a seat.  For the
```

```
 1   record, can you please state your full name.
 2          THE WITNESS:  Sure.  It's Roberto, R-o-b-e-r-t-o.
 3   Last name is Amenta, A-m-e-n-t-a.
 4          THE COURT:  You may.
 5          MR. AVEIS:  Thank you.
 6                       ROBERTO AMENTA,
 7   called as a witness by the government, was sworn and testified
 8   as follows:
 9                     DIRECT EXAMINATION
10   BY MR. AVEIS:
11   Q    Mr. Amenta, by whom are you employed?
12   A    I'm employed with the Federal Reserve Bank of New York.
13   Q    And where's your duty station?
14   A    In Manhattan, in New York City.
15   Q    What is the Federal Reserve?
16   A    The Federal Reserve is the central bank of the
17   United States.  The Federal Reserve Board, along with the
18   12 reserve banks, comprise of the Federal Reserve system.  I
19   work for one of the 12 reserve banks, the Federal Reserve Bank
20   of New York.
21   Q    What is the function of the Federal Reserve?
22   A    It has a few functions.  Obviously it sets monetary
23   policy.  It is also a bank regulator for state member banks.
24   And it also provides financial services to the banking
25   industry, whether it's, you know, distributing cash on behalf
```

```
 1   of the government or providing wire transfers through a product
 2   called Fedwire.
 3   Q     What is Fedwire?
 4   A     Fedwire is an electronic funds transfer system in which
 5   individuals, financial institutions, can send payments to each
 6   other.
 7   Q     So how does that work?
 8   A     So a financial institution will have an account with the
 9   Federal Reserve Bank of New York.  They will ask the
10   Federal Reserve for access to a product called Fedwire.  The
11   Federal Reserve will then vet the financial institution,
12   because it's only allowed by domestic institutions or foreign
13   bank with domestic financial institutions in the U.S.
14         That institution will then be given the Fedwire tokens,
15   products, and then they can proceed with wire transferring.
16   Q     So is it a fair statement that, if a particular bank is in
17   one state and wants to wire money to a bank in another state,
18   that goes through the Federal Reserve through the Fedwire
19   system?
20   A     Yeah, if they use the Fedwire system.  Obviously there's
21   competitors to Fedwire.  But if they use our system, they would
22   go through the Federal Reserve, yes.
23   Q     And is there a document or documents that memorialize a
24   Fedwire?
25   A     We have a reference guide that explains field tags and the
```

1    federal -- the wire transfer for the Fedwire funds transfer.

2    Q     All right.  Are you familiar with the records that

3    identify particular Fedwires?

4    A     Yes.

5              MR. AVEIS:  All right.  So, Your Honor, at this time

6    the government has marked and received through the Court's

7    order the following exhibits that I would like to hand to the

8    witness rather than have him thumb through the individual tabs.

9         They are as follows:  175, 178, 231, 232, 233, 269, 270,

10   271, 672, 673, 674, 728, and 729.

11             THE COURT:  One moment.  You may.

12             MR. AVEIS:  Thank you.  May I approach the witness

13   with that?

14             THE COURT:  You may.

15             THE WITNESS:  Thank you.

16   BY MR. AVEIS:

17   Q     You are welcome.

18        Mr. Amenta, would you take a minute to look through those

19   exhibits that I just identified.

20   A     Sure.  Okay.

21   Q     All right.  So looking at No. 175 --

22             MR. AVEIS:  May I have permission to publish this,

23   please?

24             THE COURT:  You may.

25   BY MR. AVEIS:

1    Q    So I have on the overhead right now Government's

2    Exhibit 175.  Can you please look at this document and tell us

3    generally what this document relates to.

4    A    This is a Fedwire funds transfer.  It's unique because it

5    has an IMAD and an OMAD, which are unique to Fedwire.

6    Obviously originating beneficiaries will be on other wire

7    transfer systems, but IMADs and OMADs are a unique fingerprint

8    to a Fedwire for that transaction.

9        There's a field tag called an IMAD, which is 1520, and

10   then there's a field tag called an OMAD, which is 1120.

11   Q    And IMAD is "Input Message" --

12   A    -- "Acceptance Data" I think it says.

13   Q    And OMAD is "Output Message Acceptance Data"?

14   A    Yeah.  Those are -- the IMAD is inputted by the

15   originating financial institution, and the OMAD is appended by

16   the Federal Reserve.

17   Q    All right.  So we've previously heard testimony in this

18   case that relates to the origin and destination of wires from

19   one state to another.  Is it accurate to point -- to ask you

20   that and testify that this represents that this particular wire

21   transfer went through the Federal Reserve?

22   A    It did.  So you can tell that by looking at the OMAD.  The

23   last four digits on that says "FT01."  FT01 is our facility in

24   East Rutherford, New Jersey.

25   Q    All right.  So that would move from one state through

**UNITED STATES DISTRICT COURT**

1    New Jersey into another state.  Is that accurate?

2    A     Right.  So wherever the originating bank and the

3    beneficiary bank had their wire transferring systems, the

4    middle part, the Fedwire part is that -- is that

5    East Rutherford, New Jersey location.

6    Q     All right.  And where it says "originator" at the bottom,

7    does that commonly indicate the name of the financial

8    institution that's originating the wire transfer?

9    A     It would be the institution or the company or the

10   individual who is the originator.

11   Q     All right.  And beneficiary, would that oftentimes be a

12   destination or recipient?

13   A     Correct.  Again, the same thing, could be a financial

14   institution, could be a company, could be an individual

15   receiving the funds.

16   Q     Have you looked at all of the exhibits that I identified?

17   A     I have.

18   Q     And is your testimony the same in terms of interpreting

19   the source destination and passage of the wires from one state

20   to another relating to these wires through East Rutherford,

21   New Jersey?

22   A     Just one second.  I just want to make sure they all say

23   FT01.  Yes, all these wires went through our facility in

24   East Rutherford, New Jersey.

25          MR. AVEIS:  If I could just have a moment, please.

**UNITED STATES DISTRICT COURT**

```
 1                    THE COURT:  You may.
 2    BY MR. AVEIS:
 3    Q    At the very bottom, there's an entry 6000.  Does this code
 4    commonly refer to the title order or information that is unique
 5    to the particular transaction?
 6    A    It's a field that's put in by the originator.  So I'd be
 7    guessing at what that is.
 8    Q    Is that commonly what happens?
 9    A    Yeah.  It could be for an invoice.  It depends on what the
10    originator wants to put in there.
11                    MR. AVEIS:  Very good.  I have no further questions.
12    Thank you.
13                    THE COURT:  Cross-examination for Mr. Patterson?
14                    MR. MESEREAU:  No questions, Your Honor.
15                    MS. YU:  No cross.
16                    THE COURT:  You may step down.  Thank you.
17                    THE WITNESS:  Thank you.  Should I return these?
18                    MR. AVEIS:  I'll retrieve them.  Thank you.
19                    THE COURT:  Next witness.
20                    MR. AVEIS:  The government's next witness is
21    Timothy Lee.
22                    THE COURT:  Can we have a sidebar briefly.
23                        (The following was held at sidebar
24                         outside the presence of the jury.)
25                    THE COURT:  What is the status of the litigation as
```

 1    it relates to the issue of Mr. Lee and tax returns?

 2            MR. AVEIS:  Right.  I apologize for doing that.  I

 3    gave defense counsel a heavily redacted and extracted version.

 4    What I did was I went to Government's Exhibits 2000 and 2001.

 5    Those are the tax returns and related documents.  I pulled out

 6    the pages that we don't need.  Most of that is the income

 7    information.

 8        And then I redacted from the pages that I'd like to

 9    introduce the income and related information and gave that to

10    counsel.  I should have asked them to complete their analysis

11    because we are going to need -- I can broadcast this, but we

12    are going to need some flavor or additional copies of it for

13    the witness.

14            THE COURT:  Have you had a chance to look at this?

15            MR. MESEREAU:  I did.  He's not trying to show his

16    income or deductions.  He's focusing on the real estate

17    transaction, the capital gains.  He appears to have redacted

18    the stuff.  I think we can live with that.

19            THE COURT:  All right.

20            MR. MESEREAU:  Thank you, Your Honor.

21            (End of sidebar discussion.)

22            MR. AVEIS:  Your Honor, if I can indulge the Court,

23    can we ask the court clerk to make a copy of this so that

24    defense counsel has it available while I do the witness

25    examination?

```
 1              THE COURT:  You may.

 2              MR. AVEIS:  All right.  Very well.  However many you

 3   need.

 4              THE COURT:  Make two for now.

 5              (Pause in proceedings.)

 6              THE COURT:  You may proceed with Mr. Lee.

 7              MR. AVEIS:  The government calls Timothy Lee.

 8         Mr. Lee?

 9              THE COURT:  Please approach and raise your right

10   hand.  Do you swear the testimony that you are about to give in

11   this proceeding will be the truth, the whole truth, and nothing

12   but the truth so help you God?

13              THE WITNESS:  I do.

14              THE COURT:  Take the witness stand and state your

15   name and spell your last name.

16              THE WITNESS:  My name is Timothy Lee.  Last name

17   spelled L-e-e.

18                          TIMOTHY LEE,

19   called as a witness by the government, was sworn and testified

20   as follows:

21                       DIRECT EXAMINATION

22   BY MR. AVEIS:

23   Q    Mr. Lee, good morning.  What do you do for a living,

24   please?

25   A    I'm an accountant.
```

UNITED STATES DISTRICT COURT

```
 1   Q     Are you a certified public accountant?
 2   A     Yes.
 3   Q     Where is your license?  In what state?
 4   A     California.
 5   Q     And for how long have you been a certified public
 6   accountant?
 7   A     13 years.
 8   Q     And as part of your job as a CPA, do you prepare tax
 9   returns for individuals?
10   A     Yes.
11   Q     For how many years have you been doing that?
12   A     Around 18 years.
13   Q     Where is your office?
14   A     City of Orange.  Do you needed the address?
15   Q     No, thank you.  I take it in the course of your
16   responsibilities of preparing tax returns for individuals you
17   are familiar with the kind of forms necessary to file a federal
18   income tax and a California income tax return?
19   A     Yes.
20   Q     Do you know Jason Patterson?
21   A     Yes.
22   Q     How do you know him?
23   A     He's my client.
24   Q     Do you see him in court?
25   A     Yeah.
```

**UNITED STATES DISTRICT COURT**

1   Q    Can you please point him out and tell us where he's seated

2   and what he's wearing.

3   A    Right there.  A gray shirt with a blue tie.  I'm sorry.

4   Right there (indicating).

5   Q    Which table?

6   A    That table with --

7   Q    Counsel table?

8   A    I'm sorry.

9        THE COURT:  There's three individuals at counsel

10  table.  There's a female.  We'll call her one.  There's an

11  individual in the middle.  We'll call him two.  And then

12  there's a gentleman closest to me.  We'll call him three.  Who

13  is it?

14        THE WITNESS:  One in the middle.

15        THE COURT:  Number two?

16        THE WITNESS:  Number two, yeah.

17        THE COURT:  Okay.

18        MR. AVEIS:  All right.  May the record reflect that

19  he's identified the defendant Jason Patterson?

20        THE COURT:  It may.

21        MR. AVEIS:  Thank you.

22  BY MR. AVEIS:

23  Q    So when did you first meet the defendant Jason Patterson,

24  sir?  Do you recall when you first met him?

25  A    Around 2000 -- maybe 2010.

1   Q    All right.  And why did he come to your office, if you

2   recall?

3   A    He called me up and -- to set up an appointment to do his

4   income tax return.

5   Q    And do you recall what tax years he asked you to do his

6   returns for?

7   A    It was 2008 and '9.

8   Q    So, again, we are in about March 2010.  Is that accurate?

9   That's about the time that he consulted you?

10  A    Probably.  I'm not certain, but probably, yes.

11  Q    All right.  So in the course of interviewing Mr. Patterson

12  to prepare his tax returns, did you ask him questions?

13  A    Yes, uh-huh.

14  Q    Was that your routine to ask questions of the taxpayer to

15  learn information to put on the returns?

16  A    Yeah, uh-huh.

17  Q    Okay.  And did you use the answers that he gave you to

18  prepare his tax returns for 2008 and 2009?

19  A    Yes, uh-huh.

20  Q    Did he give you any documents to support information for

21  his tax returns?

22  A    Some documents I made a copy.  Others he had a -- he wrote

23  an amount on the piece of either small notepad or a Post-it

24  note.  He wrote it down.  And sometimes I make copies of those.

25  I don't recall if I made a copy of the Post-it note.  But some

1  of the expenses that he had, he had it on a either notepad or a

2  Post-it note.

3  Q    All right.  And on the basis of the documents that he gave

4  you and the answers that he gave to you, did you prepare his

5  2008 and 2009 federal income tax returns?

6  A    I believe so, yes.

7           MR. AVEIS:  All right.  At this point, I'm going to

8  need the returns.

9           THE COURT:  Nothing is going smoothly this morning.

10  We are making copies of some exhibits.  Oh, maybe it went a

11  little smoother than I had hoped.

12      If you would give copies to counsel, Ms. Hernandez.

13  Ms. Hernandez, Mr. Braun doesn't need one.  Just give one to

14  Mr. Mesereau.  He passed it along for Ms. Yu.  Ms. Hernandez,

15  Mr. Mesereau.

16           THE CLERK:  Yes, I gave him one.

17           THE COURT:  No, two, they should have two.

18           THE CLERK:  Is that for the witness, Mr. Aveis?

19           MR. AVEIS:  Yes.  If I can just have a second to

20  confer with counsel.

21           THE COURT:  Sure.

22           (Discussion held off the record.)

23           MR. AVEIS:  Your Honor, I conferred with counsel,

24  and with the Court's permission, I believe we have a

25  stipulation that this Exhibit 2000 as redacted can be received

1    in evidence.  It's actually 2000 and 2001.

2              THE COURT:  Okay.  Admitted.

3              (Exhibit Nos. 2000 and 2001 received into evidence.)

4              MR. AVEIS:  Thank you.  May I publish these?

5              THE COURT:  You may.

6    BY MR. AVEIS:

7    Q    All right.  So, Mr. Lee, on the screen in front of you,

8    I'm going to broadcast a couple of documents.  If you wouldn't

9    mind taking a moment to look at the first page, which is

10   Exhibit 2000, page 1 of 38.  Do you recognize this document?

11   A    Yes, uh-huh.

12   Q    Is this the first page of the 2008 federal income tax

13   return, page 1040, that you prepared for Mr. Patterson --

14   A    Yes, sir.

15   Q    -- based upon your meeting in March of 2010?

16   A    Yes, sir.

17             THE COURT:  I apologize.  Can I see counsel one more

18   time?

19                  (The following was held at sidebar

20                  outside the presence of the jury.)

21             THE COURT:  Mr. Mesereau, do you want to say

22   something to the jury?  They are getting this thing with all

23   the -- that we are not hiding something from them, that we are

24   just intending to present what's relevant?

25             MR. MESEREAU:  That's an excellent idea, Your Honor.

1          THE COURT:  Okay.  Because all they see are these

2     black lines.  You know, we are not hiding anything from them.

3     All we want to do is to present to them evidence that's

4     relevant to this case.

5          MS. YU:  Thank you, Your Honor.

6          (End of sidebar discussion.)

7          THE COURT:  Ladies and gentlemen, you are going to

8     see these returns with blackout lines, and all I want to say is

9     this.  We are not trying to hide anything from you, but all we

10    are trying to do is present relevant evidence to you.  So don't

11    interpret anything by the black marks, and just consider what's

12    been presented to you.  So, again, we are not trying to hide

13    anything.

14    BY MR. AVEIS:

15    Q    Mr. Lee, on the page that we've been talking about on the

16    top --

17         THE JURY:  This is still on the sidebar mode.  We

18    can't hear you.

19         THE COURT:  Okay.  I'm sorry.  Is it off now?

20         THE CLERK:  Yes.

21         THE COURT:  Were you able to hear the comments I

22    just said?

23         THE JURY:  We didn't hear over there.

24         THE COURT:  No.  No.  You heard what I said about

25    the blackouts?

1          THE JURY:  Yes.

2          THE COURT:  Okay.

3    BY MR. AVEIS:

4    Q    Okay.  So we are dealing with this page 1 of 38 of

5    Exhibit 2000.  Mr. Lee, the information that's in the top

6    section, first name and home address and what have you, did you

7    obtain that information from Mr. Patterson in or about March of

8    2010?

9    A    Well, I obtained that information from 2007 tax returns.

10   So this is my routine.  I will look at the prior tax return.  I

11   will -- obviously the name shouldn't change, but I will

12   check -- verify the social, the address, and the filing status

13   of everybody that I prepare tax returns.

14        So 2007 was prepared by somebody else, and I had a copy of

15   2007.  So I would just ask Jason is this is your social, is

16   this your address, and then I would proceed with the filing

17   status.

18   Q    So you'd confirm with him that this was the -- his address

19   and --

20   A    Yes, uh-huh.

21   Q    And you imported this from, in part, a prior year's tax

22   return?

23   A    Yes, sir.

24   Q    A 2007 return?

25   A    2007 return, right.

1   Q     All right.  On the next page at the bottom, it has the

2   affirmation section.  Was that your -- is that your name,

3   business address, and the date -- approximate date on which the

4   return was electronically filed with the IRS?

5   A     I'm not sure.  This was 2008.  So I don't think we can

6   e-file.  This was a late return.  So it was probably filed on

7   paper.  The date is the date that I prepare the tax return.

8   Q     I misspoke.  Was it your practice to prepare the return

9   and then provide the return for filing to the customer and have

10  the customer or client make sure that that was mailed to the

11  IRS?

12  A     No, no.  All the returns are required to e-file unless the

13  client stated otherwise.  So if the returns are filed within

14  the filing period, which is October 15th, including extension,

15  I would automatically e-file it.  Return -- I believe this

16  return was delinquent.  It was a 2008 return.  So it was -- it

17  had to be filed on paper.

18  Q     That's what I meant.  So this was a --

19  A     Yes.  I would give a copy to a client to mail the return,

20  right.

21  Q     Okay.  Very good.  Let's turn to the next page, which is 5

22  of 38.  And I'd like you to focus on the section called "Taxes

23  you paid and home mortgage interest and points."  Do you see

24  that?

25  A     Yes, uh-huh.

**UNITED STATES DISTRICT COURT**

1    Q    Where did you get the information on line 6, $8,599, under

2    real estate taxes?  Did you get that information from

3    Mr. Patterson?

4    A    Yes.

5    Q    And line 10, "Home mortgage interest and points reported

6    to you on form 1098, $50,457," where did you get that

7    information?

8    A    From Jason.

9    Q    Mr. Patterson?

10   A    Right.

11   Q    Let me turn to the next page which is called "Schedule D,

12   capital gains and losses."  Do you see that in front of you?

13   A    Yes, I see that.

14   Q    There's a line item here, No. 1, that relates to a

15   property called One Third Place, No. 403, Long Beach, and has

16   date acquired, date sold, a sales price, a cost, and a gain.

17   Did you obtain this information either from Mr. Patterson or

18   from documents that he gave to you?

19   A    He gave me a document.  I believe it's escrow closing

20   paper.  He bought and sold a house at a gain.  So he had a -- I

21   think it was escrow closing paper indicating the sales price

22   and then purchase price as well.  And the difference was a gain

23   on it.

24   Q    And where it says, "Date acquired, March 13, 2008," and

25   "Date sold, December 23, '08," did you get that information

**UNITED STATES DISTRICT COURT**

```
 1   either from him or from the settlement statement?

 2   A     Yeah, I believe he provided the settlement statement, yes.

 3   Q     And "Gain or loss," is that also, in English, profit?

 4   A     I'm sorry.  English profit?

 5   Q     Would you also say that would be called profit?

 6   A     Yeah.  He --

 7   Q     Okay.  Let's move on.  The next document, which is page 30

 8   of 38, this is called a Form 1098 Mortgage Interest Statement.

 9   Is this the kind of document that a lender would send to a

10   holder of a mortgage, somebody who owed the bank money on a

11   home loan?

12   A     Yes.

13   Q     Did you obtain this document from Defendant Patterson?

14   A     Yeah, Jason.

15   Q     Did you use this information to prepare the income tax

16   return?

17   A     Yes.

18   Q     Under this particular line, 1, under "Mortgage interest

19   received from payer/borrower, 14,934," do you see that?

20   A     Yes, uh-huh.

21   Q     Now, earlier we looked at another entry on the tax return

22   under itemized deductions.  So I'd like you to keep that

23   $14,000 figure in mind, and I'll show you the itemized

24   deduction.  Do you see the 57,457?

25   A     Yes, uh-huh.
```

**UNITED STATES DISTRICT COURT**

```
1    Q    So the 14,934.80 --
2         THE COURT:  I'm sorry, Counsel.  You misspoke.  You
3    said 57,000, not --
4         MR. AVEIS:  I'm sorry, 50,457.  Thank you.
5    BY MR. AVEIS:
6    Q    Referring to the 14,934.80, would that be reported on
7    line 10 as home mortgage interest?
8    A    I think that was a part of it.
9    Q    Yes?  And so there's a difference.
10   A    Yes.
11   Q    Can you explain the difference?  What was the information
12   that you had to provide for that additional amount of money?
13   A    He also had a mortgage with another person, his partner or
14   friend, who owned a half of the home where the other person
15   pays half, Jason paid half.  And that was the -- I didn't get a
16   10 -- either I -- I don't recall off the top of my head whether
17   I had a copy of the 1098.  But that year either he provided the
18   information to me, was about 20,000, another one about 8,000, I
19   believe, related to the home mortgage where he paid half, his
20   partner paid half basically.  So he took half of the deduction
21   on that property.
22   Q    Was this information that you learned from
23   Defendant Patterson?
24   A    Yes.
25   Q    You also mentioned that some of the information that you
```

```
 1   used to create -- to prepare the tax return came from the
 2   settlement statement that Mr. Patterson provided to you.  I'd
 3   like to show you page 32 of 38 of the materials that are part
 4   of Exhibit 2000.  Do you recognize this document?
 5   A    Yes, I do.
 6   Q    Was this the settlement statement that Defendant Patterson
 7   gave to you in March of 2010 on which you, in part, based your
 8   tax return preparation work?
 9   A    Yes, uh-huh.
10   Q    Okay.  And this relates to the One Third Place property?
11   A    Yes, uh-huh.
12   Q    I'm sorry.  I forgot to ask you one thing.  At the top,
13   you wrote the word "purchase."  Is that your printing?
14   A    That is not my handwriting.
15   Q    You don't recognize that?
16   A    No.
17   Q    Okay.
18   A    I mean, it is a purchase obviously.  The date is March 13,
19   2008.  So, I mean, it's a purchase paper.  But I didn't write
20   the purchase on it.
21   Q    Did you work with anyone else to create this return or was
22   this your work?
23   A    This was my work.
24   Q    And do you recall whether the word "purchase" was on this
25   document when you got it from Mr. Patterson?
```

84

```
 1   A      I don't recall.
 2   Q      All right.  But no one else was involved in the process,
 3   and this is not your printing; is that right?
 4   A      Yeah, I don't think that's my handwriting.  But it is a
 5   purchase document, yes.
 6   Q      Okay.  Let's turn to the next document.  Was this also --
 7   this is page 35 of 38 of Exhibit 2000.  Is this another
 8   document that you received from Mr. Patterson in March of 2010?
 9   A      Yes, I believe so.
10   Q      And this has the word "sale" on it.  Is that your
11   printing?
12   A      No, it's not my handwriting.
13   Q      Okay.  And, again, no one else involved in the tax return
14   preparation; is that right?
15   A      That is correct.
16   Q      Okay.  And did you use this to calculate the information
17   on Schedule D that you looked at that relates to the purchase
18   date, sale date, and the profit?
19   A      Yes.
20   Q      You also prepared his 2009 return as a result of that same
21   March 2010 meeting; is that right?
22   A      Yeah, I think it would be two years' worth, yeah.
23   Q      So showing you page 1 of 69 of Exhibit 2001, do you
24   recognize this as the return that you prepared for 2009 for
25   Defendant Patterson?
```

**UNITED STATES DISTRICT COURT**

1    A    Yes, sir.

2    Q    And, again, did you derive the information about his

3    residence from him or from a combination of that and his prior

4    return?

5    A    Combination of that and his prior return.

6    Q    Okay.  Turning to the next page at the bottom, does this

7    indicate approximately the date on which the return was

8    prepared and then provided to him to be mailed into the IRS?

9    A    Yes.

10   Q    Okay.  Moving to the next page, this is itemized

11   deductions, the same form we looked at.  If you look at line 6,

12   "Real estate taxes," and then look at line 10, "Home mortgage

13   interest" -- do you see those entries?

14   A    Yes.

15   Q    Did you get that information that you put on this return

16   from talking to Mr. Patterson or from a combination of that and

17   any documents he gave you?

18   A    I'm going to say probably 1098 mortgage interest.

19   Q    The same kind of form we just looked at?

20   A    Yes, uh-huh.

21   Q    Okay.

22   A    I believe he also -- that includes half of the mortgage

23   that he paid with his partner.

24   Q    You anticipated my next question.  So this wasn't solely

25   mortgage interest from any given property that he may have

1    solely owned, but it was an -- it intended to show his claim to

2    a part of a mortgage on a different property; right?

3    A    Yeah.

4    Q    That he said that he owned with whom?

5    A    I believe it's Michael.

6    Q    Michael Murphy?

7    A    Michael Murphy, yes.

8    Q    Did Mr. Patterson describe his relationship with

9    Mr. Murphy?

10   A    Not at that -- I don't recall at that time.  I know at

11   that time when I was doing his return, I knew it as a friend or

12   partner and just someone who owns half of the house.

13   Q    At some point after that --

14   A    After -- maybe a couple years later, the subject came up

15   regarding filing status.  And I asked him or he provided to me

16   what their -- he was in a relationship with Michael Murphy and

17   that in 2012, I believe, we had to file a tax return indicating

18   that was -- there is terminology.  I forget -- as married

19   filing separate return I believe it was.

20   Q    So he indicated to you he was in some kind of domestic

21   relationship --

22   A    Yes, uh-huh.

23   Q    -- with Mr. Murphy?  Very good.

24        Continuing on the same return, Exhibit 2001, page 11 of

25   69, at the bottom there's a section called "Amortization."  It

1  says "Points, 850 East Ocean Boulevard, date amortization

2  begins."  Do you recall talking with Mr. Patterson and/or

3  getting information from documents that -- on which you based

4  your entries here?

5  A    Yes.

6  Q    What are points?

7  A    Points are -- points that the taxpayer paid to the bank,

8  just like a mortgage interest.

9  Q    Like interest; right?

10 A    Right.

11 Q    So you can't -- you have to treat them specially on the

12 return about how you take a deduction for them; right?

13 A    Yeah.  If it's a refinance, you have to amortize based on

14 the life of the loan.  If it's a purchase, you deduct it in the

15 same year you purchased your house, just like a mortgage.

16 Q    Okay.  And where it says "Date amortization begins," is

17 that intended to show the date that the taxpayer would buy the

18 property?

19 A    Yes, or refinance, whatever.

20 Q    Or refinance?

21 A    Right, yeah.

22 Q    Continuing on, Exhibit 2001, page 24 of 69, this is a

23 1098; right?

24 A    Yes.

25 Q    And was this 1098 a document you got from

1  Defendant Patterson that identified the mortgage interest for

2  the property called 850 East Ocean Boulevard, Unit 512?

3  A    Yes.

4  Q    So earlier you mentioned that the mortgage interest that

5  you calculated, which is 33,195, was more than the mortgage

6  interest that connected to 850 --

7  A    Right.

8  Q    -- East Ocean; right?

9  A    Right.

10  Q    And was that difference again information that

11  Defendant Patterson told you about that related to his claim of

12  one half of the mortgage on a different property?

13  A    Right.

14  Q    Now, in connection with preparing that return, did you get

15  this next document, 2001, page 28 of 69, which is a buyer's

16  closing statement related to a property called 850 East Ocean,

17  No. 512?  Did you get that from Defendant Patterson?

18  A    Yes, uh-huh.

19  Q    Do you see this printing here, "second home"?

20  A    That's my handwriting, yes.

21  Q    Where did you get that information?

22  A    This document?  From a client.

23  Q    Yes.  And where did you get the information to call this

24  second home?

25  A    Oh, I asked him, is this a second home.

```
 1   Q    And he said?

 2   A    Yes.  And I think I wrote down second home.

 3   Q    So that's March 2010.  Let's move back -- or move up in

 4   time five or so months later.  Did Defendant Patterson reach

 5   out to you and ask you about -- ask you for advice about

 6   perhaps filing an amended tax return?

 7   A    2009?  Yes.

 8   Q    So did you get something from Defendant Patterson by fax

 9   or mail that you used to help prepare an amended tax return for

10   him?

11   A    Yes, uh-huh.

12   Q    All right.  So let me show you page 29 of 69 of

13   Exhibit 2001.  Do you recognize this cover sheet?

14   A    Yes.

15   Q    That's you; right?

16   A    I'm sorry?

17   Q    Timothy --

18   A    Yes, that's me, uh-huh.

19   Q    You got this from Defendant Patterson by fax; is that

20   right?

21   A    Right.

22   Q    Do you see the numbers up here at the top, 562-986-1937?

23   Is that your fax number or is that his fax number?

24   A    I don't know what that number is.  I'm assuming -- that's

25   not my fax number.  So I'm assuming it's the sender's number.
```

**UNITED STATES DISTRICT COURT**

1  Q     The sender's number?

2  A     Right.

3  Q     So the next page -- this is 1 of 7 -- is 2 of 7.  Do you

4  recognize this letter, "Dear, Timothy"?

5  A     Yes.

6  Q     And did you get this letter as part of that same fax from

7  Defendant Patterson?

8  A     Yeah, either fax or e-mail.  I don't recall.  But yeah,

9  I've seen this.

10  Q     Okay.  So it says, "As we discussed on the phone, in our

11  2009 tax return, we failed to account for the rental income for

12  850 East Ocean Boulevard, No. 512, from July '9 to 12/9."  What

13  was that phone conversation?

14  A     As I recall, I think he call me up after the return was

15  filed.  He said he had a rental income for the few months after

16  he purchased it, and I don't think he accounted for that.  And

17  I don't remember if I said -- I told him to amend it or he

18  wanted to amend it, but I told him if it's rental income, he

19  should amend it.  So we amended the return, including the

20  rental income portion of it.

21  Q     And when you met with him to prepare the original 2009

22  return, that was, again, March 2010; right?

23  A     Yes, around that time.

24  Q     Okay.  And he gave you the purchase agreement -- excuse

25  me.  He gave you the settlement statement for the -- that

1    particular property at that time, and we've looked at that,

2    and that's -- I'll show you on the overhead.  That's this

3    settlement statement that relates to East Ocean.  And its

4    closing date is February 13, '09; right?

5    A    Yes.

6    Q    So where he says that -- a year later he's meeting with

7    you and he says, "We failed to account."  When you met with him

8    in March 2010, did he mention anything to you that the property

9    called 850 East Ocean Boulevard had generated rental income?

10   Did he mention that to you at the original time?

11   A    I don't think -- I don't believe so.

12   Q    Would that be something that in your practice you would

13   expect the taxpayer to tell you?

14   A    Normally I would ask if you have any rental income and

15   things like that.  I don't particularly remember what I asked

16   him.  But all my clients, if they have more than one house, I

17   would ask do you have a rental income and expenses, and I would

18   just move on, yeah.

19   Q    All right.  And he -- this property was called "second

20   home."

21   A    Yeah.

22   Q    So in connection with this letter then, it says, "We

23   failed."  I assume that doesn't mean you failed to do anything?

24   A    Well, if --

25   Q    Let me move on.

1    A     Yeah.

2    Q     It says, "to account for the rental income," and then it

3    has a time frame, July '9 to 12/9, meaning July 2009 to

4    December 2009.  And then it has various pieces of information

5    here.  And it indicates that there are some attachments.

6          So did you use this information to prepare an amended

7    income tax return for Mr. Patterson based -- for the year 2009?

8    A     Yes.

9    Q     Okay.  And among the documents that he provided to you,

10   did he give you this property detail report that identifies the

11   property at the bottom?

12   A     I think this came from Jason, yes, uh-huh.

13   Q     Now, there's some jottings here, just so we understand

14   these.  This shows a recording date and other writings.  Is

15   this your printing here?

16   A     That's my handwriting, yes.

17   Q     So what you are doing there is you're separating out the

18   cost basis based upon the land assessed by the assessor and

19   then what the property improvements would be for purposes of

20   depreciation; right?

21   A     Yes.  Yes, sir.

22   Q     So what's depreciation just so the jury and the Court --

23   or jury knows?

24   A     Depreciation is, instead of writing expense, you have to

25   depreciate it over 27.5 years for rental property, not the

```
 1   land, just the building.
 2   Q    You can do that for rental property, but you can't do that
 3   for your own home unfortunately; right?
 4   A    That is correct, sir.
 5   Q    Otherwise, everybody would be rushing to amend their tax
 6   returns right now, I would assume.
 7   A    Yeah.
 8   Q    Did he also provide to you this same 1098 that showed the
 9   mortgage interest received in connection with that property?
10   A    Yeah.  This was one original when I filed the 2009 return,
11   prepared the 2009 return information.
12   Q    Okay.  And, finally, turning back to the letter, it
13   reported rental income of 1,825 a month equals a total amount
14   for 2009.  Did he tell you whether there was any other rental
15   income to report at that time?
16   A    Not that I recall.
17   Q    And at some point did you actually prepare the amended tax
18   return for him to sign and send to the IRS?
19   A    Yes.
20   Q    So looking at page 36 of 69, is this the cover page --
21   first page of the 1040X amended tax return that you prepared
22   for Defendant Patterson based upon that letter that we just
23   looked at dated August 15, 2010?
24   A    Yes.
25   Q    And that's your information, you prepared this on or about
```

```
 1   August 23, 2010; is that right?

 2   A     Yes.

 3             MR. AVEIS:  All right.  If I could just have a

 4   second, please.

 5             THE COURT:  You may.

 6             MR. AVEIS:  Thank you, Your Honor.  No further

 7   questions.

 8             THE COURT:  Cross?

 9                      CROSS-EXAMINATION

10   BY MS. YU:

11   Q     Good afternoon.

12   A     Yes, good afternoon.

13   Q     Mr. Lee, you are a certified public accountant?

14   A     Uh-huh.

15   Q     CPA?  Yes?

16   A     Yes.

17   Q     And so, when Mr. Jason Patterson came to you to file the

18   tax returns, it is you who decides to make deductions or no

19   deductions?  You are the one who was determining whether

20   something is deductible or not, right, because you are the CPA?

21   Is that a fair treatment -- statement?

22   A     I'm sorry.  Could you repeat --

23   Q     Is that a fair statement that you are the one -- since you

24   are the CPA, you decide what should be deducted or not; right?

25   A      I don't decide.  IRS decided.  Based on IRS regulation, if
```

1    IRS says certain things deductible, I would deduct it.  But I

2    don't -- I'm just a tax preparer.  I don't make a

3    determination.

4    Q    Oh, no.  What I meant was in terms of the tax returns --

5    A    Yeah.

6    Q    -- all the deductions that you've included --

7    A    Uh-huh.

8    Q    -- you made that determination as to whether it could be

9    included or not included?

10   A    Right.  Mortgages should be on schedule A.  Donations

11   should be on schedule -- yeah.

12   Q    Exactly.  So whatever information you needed, you would

13   ask Mr. Patterson --

14   A    Right, yes, uh-huh.

15   Q    -- to bring it over, and then you'd fill out the forms --

16   A    That is correct.

17   Q    -- and then -- I'm sorry.

18   A    Yeah.

19   Q    We have to make sure we don't talk over one another

20   because the madam court reporter cannot type.

21        Also, I believe you said that you met Mr. Patterson in

22   2010?

23   A    Around that time.

24   Q    Right.  Did you take over this CPA business from a prior

25   CPA that Mr. Patterson was seeing?

```
 1   A     Yes, ma'am.

 2   Q     And the two tax returns that Mr. Aveis showed you, 2008

 3   and 2009 tax returns, do you remember Mr. Patterson telling you

 4   he couldn't file them earlier --

 5           MR. AVEIS:  Objection.  It's going to call for a

 6   hearsay response.

 7           MS. YU:  No further --

 8           THE COURT:  Rephrase it.

 9           MS. YU:  Yeah.

10   BY MS. YU:

11   Q     Do you remember Mr. Patterson telling you the reason why

12   it was delayed was because of his personal problems he was

13   having?  Do you remember that?

14           MR. AVEIS:  Same objection.

15           THE COURT:  Sustained.

16   BY MS. YU:

17   Q     In the tax returns for 2008 and also 2009, the very front

18   page --

19   A     Yes.

20   Q     -- it has a single for marital status marked.

21   A     Uh-huh.

22   Q     At that time you were aware that the state law in

23   California recognized gay marriages, but the federal law did

24   not recognize gay marriages until 2011 or so, I think.  Are you

25   aware of that?
```

```
 1    A     Exact date I'm not sure, but yeah, some -- yeah, the

 2    federal didn't allow that.  The state, either 2009 or --

 3    Q     The law kept changing?

 4    A     Yeah, so I can't really say for certain.

 5    Q     And as far as you remember, Mr. Jason has always been very

 6    forthcoming with the information and very honest with you;

 7    right?

 8    A     Yes, ma'am.

 9               MS. YU:  I have nothing further.  Thank you very

10    much.

11               THE COURT:  Mr. Braun?

12               MR. BRAUN:  Nothing.

13               THE COURT:  Redirect?

14               MR. AVEIS:  Yes.

15                          REDIRECT EXAMINATION

16    BY MR. AVEIS:

17    Q     Mr. Lee, no matter the law about whether domestic couples

18    may or may not file a joint return in California or no matter

19    whether they may file a federal return, don't you, nonetheless,

20    expect from your tax return clients that they are going to

21    provide you all the information necessary on which you can base

22    the conclusions about deductions and what have you?  You are

23    reliant upon what you are told; isn't that right?

24    A     That is correct, yes.

25               MR. AVEIS:  All right.  No further questions.  Thank
```

```
 1    you.

 2                THE COURT:  Ms. Yu?

 3                MS. YU:  Nothing further.

 4                THE COURT:  You may step down.  Thank you.  You may

 5    step down.  Thank you.

 6                MR. ARKOW:  Your Honor, for the government, could I

 7    confer with defense counsel?

 8                THE COURT:  You may.

 9                (Discussion held off the record.)

10                MR. ARKOW:  The government calls Russell Boschetti.

11        And I did confer with defense counsel, and we are taking

12    this witness out of order.

13                THE COURT:  Thank you.

14                THE CLERK:  Please raise your right hand.  Do you

15    solemnly state the testimony you are about to give in the cause

16    now pending before this court shall be the truth, the whole

17    truth, and nothing but the truth, so help you God?

18                THE WITNESS:  Yes.

19                THE CLERK:  Thank you.  Please have a seat.  For the

20    record, can you please state your full name and spell your last

21    name.

22                THE WITNESS:  Russell Lyle Boschetti.  Last name is

23    spelled B-o-s-c-h-e-t-t-i.

24                MR. ARKOW:  May I proceed?

25                THE COURT:  You may.
```

**UNITED STATES DISTRICT COURT**

```
 1                          RUSSELL BOSCHETTI,
 2   called as a witness by the government, was sworn and testified
 3   as follows:
 4                          DIRECT EXAMINATION
 5   BY MR. ARKOW:
 6   Q    Mr. Boschetti, how are you currently employed?
 7   A    I'm a home mortgage consultant with Wells Fargo Home
 8   Mortgage, branch sales manager.
 9   Q    Approximately how long have you been employed in that
10   position?
11   A    Ten years in the industry, about three and a half years
12   with the company.
13   Q    And prior to working with Wells Fargo Bank, did you work
14   with Bank of America?
15   A    Yes.
16   Q    Approximately what length of time, from when to when, did
17   you work with Bank of America?
18   A    February of 2005 until November of 2011.
19   Q    And what were your positions with Bank of America?
20   A    Title was mortgage loan officer.
21   Q    I want to direct your attention specifically to the years
22   2008 and 2009 when you were employed at Bank of America for the
23   remainder of my questions unless for some reason I indicate
24   otherwise.  Do you have that --
25   A    I'm sorry?
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     -- understanding?  Were you assigned to a specific office
 2   or branch or location in 2008 and 2009?
 3   A     No.  I didn't work in a bank store.
 4   Q     So where was your office?
 5   A     Torrance, California.
 6   Q     And what was your job title again?
 7   A     Mortgage loan officer.
 8   Q     Just generally, can you describe for the jury what your
 9   responsibilities were as a mortgage loan officer for Bank of
10   America?
11   A     To meet with prospective borrowers and identify their
12   needs, understand their goals, make suggestions about
13   solutions, help them put together the details of an application
14   for approval, and obtain their mortgage.
15   Q     And did you know an individual named Jason Patterson?
16   A     Yes.
17   Q     How did you know an individual named Jason Patterson?
18   A     Jason has been a long-time client of mine.
19   Q     Client for what purposes?
20   A     Well, Jason is a prominent realtor in Long Beach.  And we
21   have had many occasions to work with one another in serving the
22   needs of our clients.
23   Q     Does that mean that Mr. Patterson has referred you
24   business?
25   A     Yes.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     Can you explain what that means.

 2   A     Mr. Patterson might have a client that's looking to

 3   purchase a home, and he frequently and regularly refers his

 4   clients to me for assistance with their mortgage needs.

 5   Q     And did you also personally handle loan applications that

 6   Mr. Patterson applied to Bank of America as a borrower?

 7   A     Yes.

 8   Q     Would you recognize Mr. Patterson if you saw him?

 9   A     Yes.

10   Q     I'd ask that you look around the courtroom and tell the

11   jury if you recognize the individual you know as

12   Jason Patterson.

13   A     Yes, I do.

14   Q     Can you describe where that person is seated or standing

15   and what he's wearing just for the record.  We can --

16   A     Yeah, gray suit, blue shirt, light blue tie.

17             MR. ARKOW:  May the record reflect that the witness

18   has identified Defendant Jason Patterson.

19             THE COURT:  It may.

20   BY MR. ARKOW:

21   Q     Do you recall taking an application for a condominium

22   purchased by Mr. Patterson for a condominium in Long Beach

23   located at One Third Place, Unit 403?

24   A     Yes.

25   Q     For purposes of the remainder of the questions, I might
```

```
 1   not give the full street address.  I'll refer to that as Unit
 2   403.  Will you have that in mind?
 3   A     Okay.
 4   Q     And to -- how does the process of taking loan application
 5   information start, and specifically how did it start in this
 6   case with Mr. Patterson for Unit 403?
 7   A     Generally the process starts with a phone call.  And
 8   specifically how did this process start?  Jason called me and
 9   let me know that he was looking to purchase a property.
10   Q     And did you collect or ask Mr. Patterson for certain
11   information that you needed to input on a form to start the
12   loan application process at Bank of America?
13   A     Yes.
14   Q     And after you collected the information, did you put it on
15   a form and then send the loan application form to Mr. Patterson
16   for his review?
17   A     I key information into a computer system, and a
18   centralized disclosure team sends a full set of the documents
19   to the borrower.
20   Q     And the borrower in this case is Mr. Patterson?
21   A     Correct.
22              MR. ARKOW:  May the witness look at what's already
23   been admitted into evidence as Government Exhibit 303?  And
24   with the Court's permission, I'd ask that it be published for
25   the jury.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  You may publish.
 2   BY MR. ARKOW:
 3   Q    We are going to be putting up some documents that are
 4   marked as certain exhibits, and they will be available for you
 5   to look at on the screen in front of you.  But there's also an
 6   exhibit binder or several binders if you prefer to look at the
 7   hard copy of the documents.  Can you see --
 8   A    My screen is blue.
 9   Q    Directing your attention to page 3 of this exhibit at the
10   bottom, do you see your name typed in as the interviewer's
11   name?
12   A    Yes.
13   Q    And do you recognize above where your name is, under the
14   borrower's signature, Jason Patterson's signature?
15   A    Yes.
16   Q    And then turning to page 1 of the document, is this a
17   document that we've generically referred to as the loan
18   application?
19   A    Yes.
20   Q    And is it a -- it's a standard document that banks and
21   other lending institutions have applicants fill out that's
22   already sort of a standard form?
23   A    It's the only form for the purpose of making a loan
24   application.
25   Q    And for this particular document, this loan application,
```

```
 1    can you confirm that this is the property that we were starting
 2    to talk about, Unit 403 --
 3    A    Yes.
 4    Q    -- on the top left?
 5         And does Mr. Patterson have to, in addition to the
 6    signature that we saw on page 3, also initial each page of the
 7    document?  And do you see his initials on each of those pages?
 8    A    I do.  Yes, and I do.
 9    Q    Now, directing your attention back to the first page, I'm
10    just going to ask you to review some of the information that
11    was collected by you and ask how you obtained that information.
12         Towards the top of the page where it says "Purpose of
13    loan" and the box that's checked is "purchase," what does that
14    mean, and how did you obtain that information?
15    A    By interviewing the applicant.  And it means that it's for
16    the purchase of -- it's seeking financing for the purpose of
17    financing the purchase of real estate.
18    Q    And specifically the Unit 403?
19    A    I'm sorry?  I don't understand.
20    Q    You say purchase of real estate.  And for this particular
21    application, it's for the purchase of specifically Unit 403?
22    A    Correct.
23    Q    And you also referred as the applicant, but in this case,
24    the applicant is Mr. Patterson?
25    A    Correct.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     And then directing your attention still about the same

 2   line of that box that -- there's also some boxes where it says

 3   "property will be," and then the choices are primary residence,

 4   secondary residence, and investment.  The box that's checked is

 5   primary residence.  Did you see that?

 6   A     Correct.

 7   Q     What does that refer to?

 8   A     It means that the property that is named on the line above

 9   that we've already discussed will be a primary residence.

10   Q     How do you obtain that information?

11   A     Interviewing the applicant.

12   Q     Directing your attention to page 3 of this document, is

13   there another section on the loan application where the lender

14   is asking whether the borrower intends to reside in the

15   property that's being purchased as the borrower's principal or

16   primary residence?

17   A     Yes.

18   Q     Is that in the section that's marked Roman Numeral VIII,

19   "Declarations"?

20   A     Correct.

21   Q     And specifically is there a subsection?  Is that

22   subsection letter L?

23   A     That's correct.

24   Q     And the box that's checked for this application, is that

25   it's -- would you read that question?
```

**UNITED STATES DISTRICT COURT**

```
1   A     "Do you intend to occupy the property as your primary
2   residence?  If yes, complete question M below."  And the
3   response is, "Yes."
4   Q     Yes to that the borrower intends to occupy it as a primary
5   residence?
6   A     Correct.
7   Q     How did you obtain that information?
8   A     By a conversation with Mr. Patterson.
9   Q     Were you also the loan officer at Bank of America in
10  connection with another loan application that Mr. Patterson
11  sought in borrowing money from Bank of America for another
12  property?
13  A     Yes.
14        MR. ARKOW:  I'd ask that the witness be shown what's
15  been previously admitted into evidence as Government
16  Exhibit 351A and with the Court's permission ask to publish.
17        THE COURT:  You may.
18  BY MR. ARKOW:
19  Q     I just want to make sure you recognize this document.
20  First turning to page 3 of this document, on the bottom portion
21  of the page where we earlier saw on the prior application the
22  interviewer's name, do you see for this application your name?
23  A     Yes.
24  Q     Your name is the interviewer?
25  A     Yes.
```

1    Q     And interviewer means what in the context of this loan

2    application?

3    A     The person that's collecting the data from the borrower.

4    Q     Do you recognize above your name the signature of the

5    borrower for this loan application?

6    A     Yes.

7    Q     Who is that?

8    A     It's Jason Patterson's signature.

9    Q     And do you also -- we can put on the overhead -- on each

10   of the pages of this loan application recognize the initials of

11   Jason Patterson?

12   A     I see them, yes.

13   Q     Maybe it would be easier, just so there are -- can you

14   look to the exhibit in the binder, that would be Volume 2, and

15   look at Exhibit 351A.  There would be a blue tab in front of

16   each exhibit.

17   A     I'm there.

18   Q     Okay.  And if you can look through all those pages, and

19   where the borrower is supposed to initial, can you confirm that

20   you recognize those initials as Jason Patterson's initials?

21   A     I mean, I see initials on the form.  I didn't personally

22   observe these issues -- these initials being made on the form.

23   This was done at closing.

24   Q     But do you recognize those initials in the borrower's

25   section of the form to be the initials that you are familiar

1  with belonging to Jason Patterson?

2  A    I can't say that I have recognition of Jason Patterson's

3  initials.  They are -- I would imagine they are his.  This is

4  something that's signed at closing in the presence of a notary.

5  Q    Is the purpose that the borrower signs each of these pages

6  of the loan application in the presence of a notary so the bank

7  can confirm and verify that the borrower has confirmed the

8  information in the application?

9  A    Yes.

10  Q    And directing your attention to page 1 of this

11  Exhibit 351A, is this in connection with a loan application by

12  Mr. Patterson for what property address?

13  A    850 East Ocean Boulevard, 512, Long Beach, California,

14  90802.

15  Q    Do you remember approximately what month and year you --

16  well, did you also collect information from Mr. Patterson for

17  this loan application?

18  A    Yes.

19  Q    And do you remember approximately what month and year you

20  collected that information from Mr. Patterson?

21  A    I do not remember, but it would be in this document.

22  January 14th of '09.

23  Q    What page are you -- and what line --

24  A    Page 3 of 7 of the exhibit next to my name as the

25  interviewer.

1   Q      And that is the date January 14, 2009?

2   A      Correct.

3   Q      And you put that date there or the computer puts that date

4   because that's the date that you collect that information?

5   A      Correct.  It's known as a notification start date.

6   Q      And for this application as well, are there -- does this

7   indicate that this is for a loan for a property that is to be

8   Mr. Patterson's primary residence?

9   A      Yes, it does.

10  Q      And where does it indicate that?

11  A      Page 1 of 7 of the exhibit, Roman Numeral II, property

12  information and purpose of loan.

13  Q      In the same place that the --

14  A      Third line.

15  Q      And is that in the same place that the prior application

16  also has the box to check whether it's a primary residence or a

17  secondary residence or an investment?

18  A      Yes.

19  Q      And does this loan application also have the declarations

20  page on page 3 where it asks the borrower if the borrower

21  intends to occupy the property as the primary residence?

22  A      Yes.

23  Q      Is the box checked "yes"?

24  A      Yes.

25  Q      And, again, is this information that you collected from

1  Mr. Patterson in starting this loan application?

2  A     Yes.

3  Q     During the loan application process for Unit 512, did you

4  become aware of -- maybe in banking terms it was called a

5  discrepancy during the review stage by the underwriter at Bank

6  of America?

7  A     Yes.

8  Q     What was the issue regarding the discrepancy?

9  A     This particular exhibit does not contain that discrepancy.

10  Q     Well, leaving aside the exhibit, what did you become aware

11  of from the underwriting that made you aware there was some

12  issue regarding Mr. Patterson's loan application for 512?

13  A     I had copied the original -- or the prior loan application

14  and failed to properly update the borrower's address.

15  Q     And did you tell that to Mr. Patterson?

16  A     Yes.

17  Q     How did Mr. Patterson react?

18  A     He was concerned that he had expressed to me that he had

19  sold the prior residence.  And when an application is copied

20  within the system, there are --

21  Q     Let me just stop you there.  What did Mr. Patterson tell

22  you when you told him that there was some issue with

23  underwriting?

24  A     In reference to the address?

25  Q     In reference to whatever you told him about underwriting

1    having some concerns about approving Mr. Patterson's

2    application.  Do you remember Mr. Patterson's reaction?

3    A    I mean, he was concerned that there was a question about

4    it.  He --

5    Q    Did he write you any letters?

6    A    Yeah.  Yes.

7              MR. ARKOW:  I'd ask that the witness be shown what's

8    already been admitted into evidence as Government Exhibit 373

9    and with the Court's permission ask to publish.

10             THE COURT:  You may.

11   BY MR. ARKOW:

12   Q    Do you recognize this document?

13   A    Yes.

14   Q    How do you recognize it?

15   A    It's typical in the process of my work to obtain letters

16   of explanation from a borrower.  And I recognize that it's

17   addressed to me and referencing the property at 850 East Ocean

18   Boulevard.

19   Q    And the number that's handwritten at the top beginning

20   with the digits 641, do you recognize that handwriting?

21   A    I do.  That's my handwriting.

22   Q    And is this the letter that Mr. Patterson wrote to you

23   after you told him that there was some issue that Bank of

24   America underwriting department was having with approving his

25   loan for Unit 512?

1    A     Yes.

2    Q     Do you remember the name of the person at the Bank of

3    America underwriting department who was handling

4    Mr. Patterson's loan application?

5    A     I do not.  I could confirm it if I am reminded of it.

6    Q     Do you think it was a name Zeoda Pavolik?  Does that sound

7    right?

8    A     Yes.  That -- she was one of the underwriters that I

9    worked with regularly.

10   Q     Do you remember her name in connection with the loan

11   application for Mr. Patterson, Unit 512?

12   A     I -- no, I don't have recall of it, but I have been

13   presented with documents where I am -- you know, I've been able

14   to confirm that that was the underwriter that worked on this

15   file.

16   Q     Now, directing your attention to this letter that you

17   received from Mr. Patterson, do you see in the first line it

18   says, "Dear, Russ:  Not only was I quite upset to hear of the

19   response from your underwriting team today, but I was also

20   confused."  Do you see that?

21   A     Yes.

22   Q     Would it be fair to say that Mr. Patterson was upset when

23   you told him that there was an issue in the underwriting

24   department?

25   A     Yes.

**UNITED STATES DISTRICT COURT**

1    Q    Directing your attention to the second paragraph, the

2    second sentence where it says, "However, after a few months

3    there, I was approached with an offer I could not refuse on the

4    home and took it."

5    A    Yes, I see that.

6    Q    Do you know what Mr. Patterson means by the words

7    "approached with an offer I could not refuse on the home and

8    took it"?

9    A    Do I know what he means by the words "I was approached

10   with an offer I could not refuse on the home and took it"?  I

11   think it's -- I mean, yeah, it's English.  He's had an

12   opportunity to sell the home.

13   Q    Did Mr. Patterson tell you what kind of opportunity this

14   was?

15   A    Not that I can recall.

16   Q    Do you know if Mr. Patterson was seeking offers to sell

17   the home he's referring to?

18   A    No, I do not know.

19   Q    Was there another letter that you received from

20   Mr. Patterson regarding his loan application for 512?

21   A    Yes.

22            MR. ARKOW:  And I'd ask that the witness be shown

23   what's already been admitted into evidence as Government

24   Exhibit 364 and with the Court's permission ask to publish.

25            THE COURT:  You may.

**UNITED STATES DISTRICT COURT**

1    BY MR. ARKOW:

2    Q    Again, Mr. Boschetti, do you recognize this document as a

3    letter that you received from Mr. Patterson in connection with

4    his loan application for Unit 512?

5    A    We are talking about Exhibit 364, page 1?

6    Q    Yes.

7    A    It doesn't make reference to Unit 512, but I know that

8    that's what it was related to.

9    Q    Do you recognize your handwriting on this letter in the

10   circle with No. 64 and then those other digits?

11   A    Yes.  Just for clarification, this is a letter that was

12   prepared by myself for Mr. Patterson to sign.

13   Q    Did you prepare this in a conversation over the phone with

14   Mr. Patterson?

15   A    Correct.

16   Q    Did you provide this letter for Mr. Patterson to review?

17   A    Correct.

18   Q    Did you ask Mr. Patterson to review the letter and then

19   sign the letter?

20   A    Yes, I did.

21   Q    Did Mr. Patterson fax you back this letter?

22   A    Yes.

23   Q    Directing your attention to the top of the page, can you

24   see below where it says "South Bay Sales"?  Can you recognize

25   any of the letters or the name below that on the fax header?

1    A    Yes.

2    Q    What is that?

3    A    It's like the fax header from when the document would have

4    been incoming to me indicating that it was sent by Jason

5    Patterson.

6    Q    And you received this letter back from Mr. Patterson?

7    A    Yes.

8    Q    Was there a third letter that you received from

9    Mr. Patterson regarding his application for Unit 512?  If I

10   showed you a document, might that refresh your memory?

11   A    Yes.  Yeah.  Thank you.

12            MR. ARKOW:  I'd ask that the witness be shown what's

13   been previously admitted as Government Exhibit 374 and with the

14   Court's permission ask to publish.

15            THE COURT:  You may.

16   BY MR. ARKOW:

17   Q    Is that a one-page letter?

18   A    Yes, it is.

19   Q    Do you recognize this as another letter that Mr. Patterson

20   sent to you?

21   A    Yes, and I recognize it as another letter that was

22   constructed by me for him to review, sign, and return.

23   Q    Why was it constructed by you with him to review, sign,

24   and return?

25   A    The underwriter asked for a specific assertion of his

1    intention.

2    Q     What was the underwriter asking for?

3    A     Confirmation of his intent to occupy the property that he

4    was purchasing.

5    Q     Was that one of the issues that the underwriter was

6    having, needing to verify that Mr. Patterson intended to occupy

7    this unit as his primary residence?

8    A     Yes.

9    Q     Did you confirm that in a conversation with Mr. Patterson,

10   that he intended to occupy Unit 512 as his primary residence?

11   A     Yes.

12   Q     Did you confirm with Mr. Patterson in a conversation that

13   he understood that, in order to have the loan approved, he

14   would need to occupy within 60 days of closing and to continue

15   occupying for at least one year?

16   A     Yes, that was the assertion that the underwriter had

17   requested, and that's the assertion that's made in this letter.

18   Q     Did you review those assertions with Mr. Patterson?

19   A     Yes.

20   Q     Did Mr. Patterson confirm those assertions?

21   A     He signed the letter and returned it, yes.

22              MR. ARKOW:  Just a moment, Your Honor.

23              THE COURT:  You may.

24              MR. ARKOW:  No further questions.

25              THE COURT:  Cross-examination?

**UNITED STATES DISTRICT COURT**

1          MR. MESEREAU:  May I take just one second,

2     Your Honor?

3          THE COURT:  You may.

4                    CROSS-EXAMINATION

5     BY MR. MESEREAU:

6     Q     Good afternoon, Mr. Boschetti.

7     A     Good afternoon.

8     Q     I'd like to first -- excuse me.  I'd like to begin by

9     asking you some questions just about the underwriting process

10    at Bank of America during this time period.

11    A     Okay.

12    Q     Bank of America during this time period was issuing

13    different types of loans to people who wanted to purchase

14    homes; correct?

15    A     Correct.

16    Q     And these different types of loans required different

17    levels of information and paperwork; correct?

18    A     Correct.

19    Q     You had, for example, what are called low document loans;

20    correct?

21    A     Correct.

22    Q     Could you please tell the jury what a low document loan

23    was.

24    A     Well, there are a number of different documentation

25    levels.  A low document loan would be one that doesn't require

1    a complete set of documents necessarily.  There's full doc,

2    there's partial docs, and in some cases no docs.

3    Q    And what was the purpose of requiring full documents for

4    one type of loan, limited documents for another type of loan,

5    and no documents for another type of loan?  What was the

6    reasoning behind that?

7    A    It's driven by investor requirements.

8    Q    Okay.  I'm not sure what that means.  Could you just

9    explain that.

10   A    Most typically residential loans, the paper is sold to an

11   investor, like a Fannie Mae or Freddie Mac, and policy is set

12   by a government agency, FHFA, and the investor determines what

13   level of documentation is necessary.

14   Q    The investor does?

15   A    Correct.

16   Q    Okay.  You also had no income, no asset loans; right?

17   A    Correct.  At Bank of America it was referred to as stated

18   income, stated asset.

19   Q    Please tell the jury what that was.

20   A    It's simply where a borrower makes an assertion about

21   their income and makes an assertion about their assets, and

22   there is no documentation of either.

23   Q    Do they just do that by phone typically or -- excuse me.

24   Did they just do that by phone typically?

25   A    I'm not sure I understand.  Did they --

**UNITED STATES DISTRICT COURT**

1    Q    Yeah.  You said no documents are required; right?  So how

2    did the information get to the bank so the bank could decide

3    whether to make a loan?

4    A    Oh, by the same mechanism, an interview by a loan officer

5    with the prospective borrower.

6    Q    Did it always require a person-to-person interview, or was

7    some of this information provided by telephone?

8    A    Oh, no, absolutely.  It could be person to person.  It

9    could be over the telephone.  There may have even been

10   availability of making an online application at that time.  I'm

11   not certain.

12   Q    Okay.  But why would you require full documents in one

13   situation, limited documents in another situation, and then no

14   documents in another situation?  What is the reasoning behind

15   that, if you know?

16   A    I can only speculate that it has to do with the perceived

17   risk associated with the loan.

18   Q    So you would issue home loans just based on what somebody

19   said over the phone?

20   A    Correct, in some cases.

21   Q    And you had what are called no income, no asset loans;

22   correct?

23   A    That's one and the same with stated income, stated asset.

24   Q    Okay.  You also had no income, no asset, no job loans;

25   right?

**UNITED STATES DISTRICT COURT**

```
1    A    I am not aware of that.

2    Q    Well, I believe in an interview with the FBI you did go

3    through the types of loans, and you mentioned -- and I can show

4    you your report if you --

5    A    I did not use the term "no income, no asset, no job."

6    Q    You didn't?

7    A    No, I did not.

8    Q    So if the agent wrote that down, it would not be correct?

9    A    Correct.

10   Q    Because the agent even had it abbreviated, NINJA."

11        MR. ARKOW:  Objection.  Counsel is just reading.

12   It's improper impeachment.

13        THE COURT:  Just ask the witness if he recognizes

14   the acronym.

15   BY MR. MESEREAU:

16   Q    If I showed you this report, would it refresh your

17   recollection whether you said that or not?

18   A    I don't need to be reminded.

19   Q    Okay.

20   A    Bank of America never had NINJ or NINJA or no income, no

21   asset, no job loans.

22   Q    According to your interview report, you also said there

23   were streamline or paper saver loans.  Did you ever say that?

24   A    Yes, I did.

25   Q    Okay.  What are they?  Just explain what they are, if you
```

**UNITED STATES DISTRICT COURT**

```
 1   would.
 2   A     Streamline would be -- an example of streamline would be a
 3   loan that maybe has a requirement for no documentation or
 4   limited documentation.  And the guideline and the investor
 5   requirement was for documentation, but the investor provides
 6   banks and lenders with automated underwriting that makes a
 7   level of determination about the necessary documentation.
 8   Q     Okay.  Now, what kind of a loan did Mr. Patterson have
 9   regarding the transactions you worked on?
10   A     As I recall, they were full document loans.
11   Q     Full document loans, okay.  And do you know why he was
12   required to give full documentation to make the purchases he
13   made?
14   A     Again, that would have been determined by the investors'
15   underwriting software.
16   Q     Okay.  I don't understand that.  If you'd explain how that
17   works.  It sounds like you are saying investors would make a
18   decision what kind of a loan you could get; is that correct?
19   A     Right.  So depending on the details of an application that
20   is submitted electronically, which would include information
21   provided by a borrower, their credit information, purchase
22   price, loan amount, loan amount relative to value, all of those
23   characteristics would determine -- would feed into software
24   that gives an output suggesting what level of documentation is
25   required.
```

**UNITED STATES DISTRICT COURT**

1  Q     Okay.  Let me ask you some questions just about the

2  process of having a loan approved at Bank of America during

3  this time period.  Okay?

4  A     Okay.

5  Q     Because there were a number of steps a loan went through;

6  right?

7  A     Correct.

8  Q     Does it begin typically with a loan officer?

9  A     Yes.

10 Q     And what did the loan officer do at that point in time in

11 this process?

12 A     Either meet with a borrower face to face or over the

13 telephone to collect the details of an application and work

14 with that borrower to collect whatever level of documentation

15 was necessary.

16 Q     And when the loan officer collected the information, where

17 did that information go?

18 A     The next step would be a processor.

19 Q     A processor?

20 A     Uh-huh.

21 Q     And what did a processor do?

22 A     Basically a processor would review a file for

23 completeness, potentially work to collect documentation that's

24 needed from third parties, prepare it for submission to the

25 underwriter.

```
 1   Q    I believe in one of your interviews you referred to a
 2   fulfillment center; is that correct?
 3   A    Yes.
 4   Q    What was the fulfillment center?
 5   A    At that time it was a processing and underwriting center,
 6   commonly referred to as a fulfillment center, in Brea,
 7   California.
 8   Q    And is that where the underwriting department was?
 9   A    That's where one of them was, yes.
10   Q    Okay.  So you start with a loan officer.  You go to the
11   fulfillment center.  Is that accurate?
12   A    Loan officer to processor who is at the fulfillment
13   center.
14   Q    And then you go to the underwriter; is that right?
15   A    And then the processor sends it to the underwriter,
16   correct.
17   Q    Okay.  And the underwriter reviews the file; correct?
18   A    Correct.
19   Q    And based on what's in the file, what does the underwriter
20   do -- or what did the underwriter do?  Excuse me.
21   A    In general?
22   Q    Yeah.  I'm just trying to give -- just get a general
23   statement of what went on, what steps went on to approve a loan
24   at Bank of America during that period of time.
25   A    So an underwriter is going to review all of the details
```

**UNITED STATES DISTRICT COURT**

```
 1   that have been received in the file, the application, any
 2   documentation that was required.  And they have a
 3   responsibility to review for completeness and to ensure that it
 4   meets the investor requirements.  Again, investor could be one
 5   of many potential investors.
 6   Q    Does the underwriter look into bank statements and things
 7   like that?
 8   A    Yes.
 9   Q    Does the underwriter look into tax returns --
10   A    Yes.
11   Q    -- documents like that?
12   A    Yes, if they are required, yes.
13   Q    And would the underwriter make calls to a bank, for
14   example, to get information?
15   A    Generally, no.
16   Q    Okay.  So you pretty much rely on the file; is that right?
17   A    Pardon?
18   Q    You pretty much rely on the file?
19   A    Does the underwriter rely on the file?
20   Q    Yes.
21   A    Yeah, the underwriter relies on the file.  If they need
22   more information, generally they make a request back through
23   the processor to the loan officer.
24   Q    And then if the underwriter approved, it went to a closing
25   department; right?
```

**UNITED STATES DISTRICT COURT**

```
1   A     Correct.

2   Q     And what did the closing department do?

3   A     Basically prepare the file to send final loan documents to

4   the closing agent.

5   Q     Okay.  Now, typically the underwriter did not have contact

6   with the borrower; is that right?

7   A     Generally, no.

8   Q     In this situation, you knew Mr. Patterson and saw no

9   problem with that; correct?

10  A     No problem with what?

11  Q     With contact with him.

12  A     For me to have contact?

13  Q     Yeah.

14  A     No.

15  Q     You knew him.  You knew him personally.  He referred

16  business to you.  And you saw nothing wrong with you talking to

17  him directly; correct?

18  A     No.

19  Q     Yeah.  Okay.

20  A     And an underwriter could also speak with him directly.  I

21  don't know whether or not they did, but they could.

22  Q     Okay.  Now --

23  A     As might the processor.

24  Q     Pardon me?

25  A     As may the processor contact the borrower.
```

**UNITED STATES DISTRICT COURT**

```
1    Q    Well, let me ask you some questions about the --
2    Mr. Patterson's purchase of One Third Place, No. 403.  Okay?
3    A    Okay.
4    Q    Were you involved in the purchase in that transaction?
5    A    Yes.
6    Q    Okay.  Now, you knew Mr. Patterson socially; correct?
7    A    Correct.
8    Q    You'd been to his wedding; right?
9    A    No, I did not attend his wedding.
10   Q    You didn't?
11   A    No.
12   Q    Did you travel with him at all?
13   A    I have.
14   Q    To the Caribbean, for example?
15   A    We did.
16   Q    But you didn't attend his wedding?
17   A    No, I did not.
18   Q    But you knew his family to some extent; correct?
19   A    Through the years of our professional relationship, yes, I
20   have become acquainted with his family.
21   Q    And at the time he purchased One Third Place, No. 403, you
22   knew he was having domestic problems with a man he ended up
23   marrying; correct?
24        MR. ARKOW:  Objection.  Vague, calls for -- no
25   foundation.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Overruled.

2   BY MR. MESEREAU:

3   Q    Did you ever hear from either Jason or anyone else that he

4   was having domestic problems with his partner?

5          MR. ARKOW:  Objection.  Calls for hearsay.

6          THE COURT:  Sustained.

7   BY MR. MESEREAU:

8   Q    Did you ever learn from Jason that he was having an up and

9   down relationship with his partner?

10         MR. ARKOW:  Hearsay.

11         THE COURT:  Sustained.  Rephrase.

12         MR. MESEREAU:  Yes.

13  BY MR. MESEREAU:

14  Q    When Jason purchased One Third Place, 403, were you aware

15  of any domestic problems he was having with Mr. Murphy?

16  A    On a very surface level.

17  Q    But you heard that there -- this was sort of an up and

18  down-type relationship; correct?

19         MR. ARKOW:  Objection.  Asked and answered.

20         THE COURT:  Overruled.

21      You may answer.

22         THE WITNESS:  Yes, there were up and downs.

23  BY MR. MESEREAU:

24  Q    Okay.  And you also knew that sometimes he stayed with his

25  father in Long Beach who was ill; correct?

**UNITED STATES DISTRICT COURT**

1   A      Yes.

2   Q      And you knew that Jason at that point didn't own his own

3   home; right?

4             MR. ARKOW:  Objection.  Vague as to "at that point."

5             THE COURT:  Rephrase.

6             MR. MESEREAU:  Yes.  Yes, Your Honor.

7   BY MR. MESEREAU:

8   Q      At the time Mr. Patterson was seeking a loan to purchase

9   the condominium at One Third Place, 403, were you aware that he

10  owned no residence in his name?

11            MR. ARKOW:  Objection.  Lack of foundation.

12            THE COURT:  Overruled.

13            THE WITNESS:  I would have to refer to the loan

14  application.  It would be confirmed there.

15  BY MR. MESEREAU:

16  Q      Okay.  But you knew at times he had been staying with his

17  partner, Mr. Murphy; right?

18  A      Yes.

19  Q      And you knew at times he was staying with his father who

20  he was taking care of; correct?

21            MR. ARKOW:  Objection.  Still vague as to "at

22  times."

23            THE COURT:  Clarify as to "at times."

24            MR. MESEREAU:  Yes.  I'll rephrase it.

25  BY MR. MESEREAU:

**UNITED STATES DISTRICT COURT**

1    Q    We are talking about the time period when he applied for a

2    loan to purchase One Third Place, 403.  Okay?

3    A    Yes.

4    Q    Looking back during the period when he had tried to obtain

5    a loan, you knew that he was kind of shuttling between his

6    lover and then husband's home and the fact that his father had

7    a home in Long Beach and his father was ill; right?

8    A    Yes, I was aware of that.

9    Q    Okay.  And I believe he told you that he wanted to

10   purchase a home in his own name; true?

11           MR. ARKOW:  Objection.  The question, it's hearsay.

12           THE COURT:  Sustained.

13   BY MR. MESEREAU:

14   Q    Did you know at that point that Mr. Patterson wanted to

15   purchase a home that he would own himself?

16   A    Yes.

17   Q    Okay.  And correct me if I'm wrong, he put 20 percent down

18   on that home; true?

19   A    I'm sorry.  I would have to refer to the application.  I

20   don't remember.

21   Q    Okay.  Do you have that in front of you?

22   A    Can you guide me to which exhibit number it is?

23   Q    Let me -- just one second.  I've got to get the number.

24   It would be Government Exhibit 303, I believe.

25           MR. ARKOW:  303, is that an application?

**UNITED STATES DISTRICT COURT**

```
1              THE COURT:  I'm sorry?

2              MR. ARKOW:  I'm just confirming that 303 is the loan

3    application.

4              THE WITNESS:  Can someone do some math with a

5    calculator?  I think it's -- I think it's maybe 25 percent.

6    BY MR. MESEREAU:

7    Q    25 percent?

8    A    Yes.

9    Q    Okay.  Now, you've had experience with people who purchase

10   properties with the desire to sell them rather quickly

11   afterwards, haven't you?

12   A    Sure.

13             THE COURT:  Mr. Mesereau, it may be confusing to me

14   and maybe the jurors that we are talking about the 403 -- One

15   Third Place, 403.

16             MR. MESEREAU:  Yes.  Yes.

17   BY MR. MESEREAU:

18   Q    What I'm asking you is this, Mr. Boschetti:  If you are

19   planning to buy a condominium and quickly sell it, you wouldn't

20   put 25 percent down, would you?

21             MR. ARKOW:  Objection.  Calls for speculation and

22   foundation for this witness.

23             THE COURT:  Overruled.

24             THE WITNESS:  It's entirely possible.

25   BY MR. MESEREAU:
```

**UNITED STATES DISTRICT COURT**

```
 1  Q      Would it be likely that you would put a 25 percent down
 2  payment if you were planning to just flip it?
 3  A      Would it be likely?  Generally, you know, someone that's
 4  an investor is going to use as little capital as necessary.
 5  Q      They are going to put as little bit down as necessary;
 6  right?
 7  A      Correct.
 8  Q      Okay.  Now, do you know whether Mr. Patterson paid any
 9  points on the loan when he purchased the property?  Maybe the
10  word is credits.  Excuse me.  The word would be credits.
11  A      Did he -- could you please re-ask --
12  Q      Yes.  He took out a loan; correct?
13  A      Yes.
14  Q      And you have the documentation in front of you, do you
15  not?
16  A      Yes, I have the application.
17  Q      Okay.  And does it say anywhere Mr. Patterson pays some
18  credits?
19  A      I want to make sure we are clear on terminology.  In this
20  example, when a borrower pays something above and beyond
21  closing costs, it's referred to as discount.
22  Q      Yes.
23  A      And yes, he did.
24  Q      And that wouldn't be consistent with someone who wanted to
25  just sell the property quickly either, would it?
```

**UNITED STATES DISTRICT COURT**

1    A    That is correct.

2    Q    Now, he also took out a 30-year loan; right?

3    A    Yes.

4    Q    That wouldn't be consistent with someone who wanted to

5    flip property quickly, would it?

6    A    No, it would not.

7    Q    People who want to flip property quickly usually want an

8    interest only loan; correct?

9    A    Yes.  At this time, yes.

10   Q    Okay.  And if you look at the correspondence that you had

11   with Mr. Patterson, he seems to be very open about where he's

12   lived, isn't he?

13   A    Yes.

14   Q    He wasn't hiding his domestic partner's address from

15   anybody; true?

16             MR. ARKOW:  Objection.  Vague and the document

17   speaks for itself.

18             THE COURT:  Overruled.

19   BY MR. MESEREAU:

20   Q    Would that be correct?

21   A    That he was not hiding --

22   Q    I mean, certainly he kept you informed, either formally or

23   informally, about where he had lived and why he had lived

24   there, where he had worked, why he had worked there, didn't he?

25   A    Yes.

1    Q     Now, let me ask you about the terms of the loan on the

2    second property that's been the subject of this inquiry; okay?

3    A     Okay.

4    Q     Do you have that information in front of you?

5    A     Can someone give me an exhibit number?

6    Q     Yes.  Let me --

7              THE COURT:  I believe it's 351A.  Is that correct?

8              MR. MESEREAU:  Which number did you say?

9              THE COURT:  351A.

10             MR. MESEREAU:  Thank you.  Yes.

11   BY MR. MESEREAU:

12   Q     Mr. Boschetti, it would be Government Exhibit 351A.  Do

13   you have that in front of you?

14   A     Yes.

15   Q     So for the loan on the second purchase, which is Unit 512,

16   what were the conditions that Mr. Patterson agreed to for that

17   purchase?  Was there a down payment?

18   A     Yes, there was.

19   Q     And what was the down payment?

20   A     On a purchase price of 269, it was 69,000 down.

21   Q     And so what was the percentage of down -- what kind of a

22   down payment did he put down percentage-wise, roughly?

23   A     Roughly I would say that's in the neighborhood of

24   25 percent.

25   Q     And that also was not consistent with someone whose plan

**UNITED STATES DISTRICT COURT**

1    is to just flip property; correct?

2    A    Correct.

3    Q    And what kind of a loan did he take out on that unit?

4    A    30-year fixed.

5    Q    And like the prior property, that was not consistent with

6    someone whose plan is to just buy investment property and get

7    rid of it; correct?

8    A    Correct.

9            MR. MESEREAU:  One second, if I may, Your Honor.

10           THE COURT:  Sure.

11   BY MR. MESEREAU:

12   Q    Now, did Mr. Patterson pay any credits on the loan in that

13   purchase?

14   A    Yes, he did.

15   Q    And how many credits were on that transaction?

16   A    2.5 points, which is significant.

17   Q    When you say "significant," what do you mean?

18   A    Most borrowers do not opt to buy their rate down that

19   considerably.  Most borrowers choose loans that are with no

20   points.

21   Q    And would paying those points at the beginning be

22   consistent with someone who wanted to quickly flip investment

23   property?

24   A    No.

25   Q    Would it be consistent with someone who wanted to purchase

1   property as a residence?

2   A    Yes.

3   Q    Mr. Boschetti, have you seen loans where people checked

4   off a box that they were going to occupy property, purchase the

5   property, and then for whatever reason changed their mind?

6   A    In theory, it could happen.  Oftentimes I am not in

7   contact with my borrowers, you know, beyond the service that

8   I've provided.  But in theory, that could happen.  That could

9   happen.

10  Q    To your knowledge, did Bank of America during this period

11  of time have any procedure for contacting someone who intended

12  to occupy their property and then for whatever reason changed

13  their mind?

14  A    I would speculate that they did, but I do not have

15  personal knowledge of that.

16  Q    Okay.  Did Mr. -- to your knowledge, did Mr. Patterson

17  make all of his mortgage payments on both units?

18  A    I have no way of knowing that.

19  Q    Okay.  But you are certainly not aware of him ever

20  defaulting on a single payment on either unit; correct?

21          MR. ARKOW:  Objection.  Beyond -- the witness --

22  beyond the scope of his knowledge.

23          THE COURT:  Sustained.

24  BY MR. MESEREAU:

25  Q    Did you ever learn --

1          MR. ARKOW:  Same objection.

2    BY MR. MESEREAU:

3    Q    -- through anyone at Bank of America that Mr. Patterson

4    ever defaulted once?

5          THE COURT:  Sustained.  Well, there's no

6    objection -- it's the same objection.  But I think -- there's a

7    difference between the first property and the second property.

8          MR. MESEREAU:  Okay.

9    BY MR. MESEREAU:

10   Q    Let's take the first property.

11         THE COURT:  The second property.  Wouldn't any

12   default when he applied for the second property be reflected in

13   his loan application on the first?

14         THE WITNESS:  That is true.  That is true.

15   BY MR. MESEREAU:

16   Q    You never saw any evidence of him ever defaulting on any

17   property; correct?

18   A    Correct.  And, furthermore, I would be notified internally

19   if I had an early payment default on a loan that I had

20   originated.

21         MR. MESEREAU:  May I take one second, Your Honor?

22         THE COURT:  You may.

23         MR. MESEREAU:  No further questions, Your Honor.

24         THE COURT:  Mr. Braun?

25         MR. BRAUN:  No questions.

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Redirect?

 2              MR. ARKOW:  Yes.

 3                    REDIRECT EXAMINATION

 4   BY MR. ARKOW:

 5   Q    Mr. Boschetti, you were asked certain questions on

 6   cross-examination regarding letters that Mr. Patterson wrote to

 7   you during his loan application process.  Do you have those

 8   questions in mind?

 9   A    Yes.

10   Q    Specifically you were asked whether Mr. Patterson was

11   being open or honest in those letters to you.  Do you remember

12   those questions?

13   A    Yes.

14   Q    I'd ask that you look at one of those letters that's

15   already been admitted, Government Exhibit 373, and directing

16   your attention to the second paragraph where it says, "As you

17   know, I purchased my very first home at First Third Place,

18   Unit 403."

19        Do you know if Mr. Patterson lived at First Third Place,

20   Unit 403?

21   A    I was never at that residence.

22   Q    Do you know if Mr. Patterson was being truthful to you

23   when he called First Third Place, Unit 403, his first home?

24   A    I have no reason to doubt Mr. Patterson.  I've never had

25   any reason to doubt his credibility.
```

```
 1   Q    But if you knew that Mr. Patterson didn't live at
 2   First Third Place, Unit 403, as his home, would that change
 3   your answer?
 4   A    Absolutely.
 5   Q    And you have no knowledge whether Mr. Patterson lived at
 6   First Third Place, Unit 403?
 7   A    I have no personal -- I did not personally observe that.
 8   Q    And when Mr. Patterson tells you in this letter in the
 9   next sentence that after a few months there, referring to
10   Unit 403, he was approached with an offer that he couldn't
11   refuse on the home and took it, do you know whether
12   Mr. Patterson was approached with any offer to buy Unit 403
13   that he couldn't refuse?
14   A    I have no personal knowledge of that.
15   Q    Do you know if Mr. Patterson had tried to lease or sell
16   Unit 403 very shortly after he bought it?
17   A    I have no personal knowledge of that.
18   Q    If you knew -- when Mr. Patterson said in this letter,
19   "However, after a few months there," you understood that by
20   this letter to mean that Mr. Patterson was living for a few
21   months in Unit 403; is that right?
22   A    Yes.
23   Q    But you don't have any knowledge whether Mr. Patterson was
24   living in Unit 403 for a few months; right?
25   A    Again, I never was at that residence.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     Well, my question is you have no knowledge that
 2   Mr. Patterson was living for a few months in unit 403; right?
 3              THE COURT:  It's been asked and answered.
 4              MR. MESEREAU:  Objection.
 5   BY MR. ARKOW:
 6   Q    If you knew that Mr. Patterson wasn't living at Unit 403
 7   for a few months, that would change your answer as to whether
 8   Mr. Patterson was being honest --
 9              THE COURT:  Counsel, that's been asked.
10   BY MR. ARKOW:
11   Q    Directing your attention to the last sentence of this
12   letter to you where it says, "Russ, this has me seriously
13   rethinking my relationship with B of A and with my personal
14   business and the level of referrals I send," what did you
15   understand Mr. Patterson to mean by writing that letter --
16   writing this sentence in the letter?
17   A    Mr. Patterson at this time had a very significant
18   relationship with B of A.  And it seems that he's questioning
19   his decision to do the amount of business that he did with Bank
20   of America at that time.
21   Q    Is it fair to say that Mr. Patterson's saying that unless
22   he gets the loan, he's going to take away business from you and
23   B of A?
24              MR. MESEREAU:  Objection.  Argumentative.
25              THE COURT:  Sustained.  Rephrase.
```

**UNITED STATES DISTRICT COURT**

```
 1   BY MR. ARKOW:

 2   Q    Did you understand Mr. Patterson to be saying he was going

 3   to direct his business elsewhere?

 4   A    I understand that he was going to rethink the

 5   relationship.

 6   Q    And Mr. Patterson asked that Bank of America find a quick

 7   resolution; is that right?

 8   A    Yes.

 9   Q    And a quick resolution means fund the loan that

10   Mr. Patterson is applying for; correct?

11            MR. MESEREAU:  Objection.  Calls for speculation.

12            THE COURT:  Overruled.

13   BY MR. ARKOW:

14   Q    Did you understand that Mr. Patterson was intending by

15   writing this that a quick resolution meant Mr. Patterson wanted

16   B of A to fund his loan?

17   A    I read "resolution" to mean an outcome, either to move

18   forward or let him know that we couldn't move forward.

19   Q    You think, if B of A had denied Mr. Patterson's loan, he

20   would have taken his referral business to you and B of A

21   elsewhere?

22            MR. MESEREAU:  Objection.  Calls for speculation.

23   He's answered the question.

24            THE COURT:  Sustained.

25   BY MR. ARKOW:
```

**UNITED STATES DISTRICT COURT**

1    Q    I want to direct your attention now to another letter that

2    Mr. Patterson wrote to you, Government Exhibit 364.

3         Now, in the second paragraph of this letter, does

4    Mr. Patterson say to you that he, in the second sentence, had

5    been staying -- that he sold First Third Place, Unit 403?  Is

6    that -- is that the first part of that sentence?

7    A    Yes.

8    Q    And then the second sentence, Mr. Patterson says that he's

9    been staying with friends and family, primarily his father.  Do

10   you see that?

11   A    Yes.

12   Q    Mr. Patterson doesn't say in this letter that he's been

13   staying with an individual named Mr. Murphy; correct?

14   A    That is correct.

15   Q    Did you know Mr. Patterson to be living in the same

16   residence as Mr. Murphy?

17   A    I can't say with certainty that I knew that at this point

18   in time.

19   Q    Did you -- but did you think it was likely that

20   Mr. Patterson at this point in time was living with Mr. Murphy?

21   You testified about this on cross-examination.

22   A    I don't have any reason to doubt.  I know that his father

23   was battling with lymphoma at the time and in need of his care.

24   I don't know where he was spending most of his time.

25   Q    Now, when Mr. Patterson was applying for these loans, both

**UNITED STATES DISTRICT COURT**

1   of them, you talked about things like credits and discounts and

2   points.  Do you remember that?

3   A     Yes.

4   Q     Let me back up and ask, from your understanding of the

5   loan application process and the terms, does someone who

6   applies for a loan stating that they are going to live in that

7   residence -- live in that real estate as their primary

8   residence receive better terms from the lender?

9   A     Most typically, yes.

10  Q     And what types of better terms would Mr. Patterson receive

11  by applying for the loan stating that he was going to live in

12  that as his primary residence?

13  A     The two that come to mind would be that for a primary

14  residence the required down payment is typically less.  And

15  with regard to interest rates, generally interest rates are

16  better on a primary residence versus an investment property.

17  Q     Do you remember at this point in time approximately how

18  much better an interest rate Mr. Patterson would have received

19  or did receive as a result of stating that he would be residing

20  in this unit as his primary residence?

21  A     How much of a better interest rate?

22  Q     (Inaudible response.)

23  A     Well, let me state it like this, that on any given day

24  there are a number of different interest rates available.  So

25  for the same rate on a primary resident or an investment

1    property, a borrower would generally -- and depending on

2    loan-to-value ratio -- would generally pay 1.25 to 1.75 points

3    more for the same rate.

4    Q    Than if they had bought the property as an investment or a

5    second home?

6    A    Second homes have the same pricing as a primary residence.

7    Q    Now, the down payment that Mr. Patterson put down for each

8    of these homes, was that a function of the underwriter's

9    analysis of the credit risk and other factors that determined

10   that Mr. Patterson had to put down that amount of down payment?

11   A    No.

12   Q    What were the factors that led to Mr. Patterson having to

13   put down the down payment that you testified he did?

14   A    His indication of how much he wants to put down as a

15   borrower.  As a loan officer, if a borrower's down payment is

16   within guidelines, we would structure it the way the borrower

17   has requested.

18   Q    And as a result of putting down a higher down payment,

19   does Mr. Patterson -- did Mr. Patterson receive a lower

20   interest rate that he would have to pay back the loan?

21   A    In general, yes.

22   Q    And in this -- in these two cases, did you think that

23   Mr. Patterson was applying pursuant to a program that was

24   referred to as the full documentation loan program?

25   A    No.  Generally a borrower wouldn't necessarily have

```
 1   knowledge of what program --
 2   Q    Well, I didn't -- I'm not asking --
 3   A    -- they are applying for.
 4   Q    For these two loan applications, do you believe that
 5   Mr. Patterson was -- these were full documentation loans that
 6   Mr. Patterson was completing?
 7   A    I expect that they were, yes.
 8   Q    And who decides whether it's a full documentation loan or
 9   a low documentation loan or something in between?
10   A    At this time a borrower could specifically opt to apply
11   for a stated income or stated asset or both stated income,
12   stated asset loan.  That's an option that a borrower had at
13   this time.
14   Q    Do you know if Mr. Patterson asked for that option?
15   A    I don't recall.
16   Q    Do you know if Mr. Patterson would have qualified to apply
17   for a loan as a low documentation loan, stated income?
18   A    It's very possible that he would have.  But, honestly,
19   guidelines during this time frame were changing daily.
20   Q    Were you aware of Mr. Patterson's credit score?
21   A    Yes, of course.  It's part of the process for a loan
22   officer.
23   Q    How did that affect what interest rates and terms
24   Mr. Patterson was able to receive from Bank of America?
25   A    To describe a specific impact would really be impossible
```

```
 1  because there are so many facets to determining a price for a
 2  loan.  Again, something that changes daily with the financial
 3  markets.
 4  Q    Do you recall being interviewed by the FBI?
 5  A    Yes.
 6  Q    Do you recall being asked about Mr. Patterson's credit
 7  score?
 8  A    Yes.
 9  Q    Do you recall saying that Mr. Patterson likely would not
10  have been offered a very good interest rate in light of the
11  credit score?
12  A    Yes.
13  Q    Do you recall telling the FBI agent that the reason
14  Mr. Patterson paid the discount points was to get a lower
15  interest rate?
16  A    Yes.  That's the reason why any borrower pays discount
17  points.
18            MR. ARKOW:  Just a moment.  No further questions.
19            THE COURT:  Recross?
20            MR. MESEREAU:  Nothing further, Your Honor.
21            THE COURT:  Mr. Braun?
22            MR. BRAUN:  No, Your Honor.
23            THE COURT:  You may step down.  Thank you.
24            THE WITNESS:  Thank you.
25            THE COURT:  Ladies and gentlemen, we are going to
```

**UNITED STATES DISTRICT COURT**

```
 1    take a short break, and then we'll resume again for some more

 2    testimony before we leave for the day.  So we'll take a 10- to

 3    15-minute break.

 4                    THE CLERK:  All rise.

 5                    (Jury out at 1:20 P.M.)

 6                    THE COURT:  In the government's case in chief, do we

 7    just have the special agent, is that it, and then we are done?

 8                    MR. AVEIS:  We have this agent's testimony,

 9    Ms. Ebadi's testimony, and then we have the brief testimony of

10    Agent Mazon regarding the Patterson proffer statements, and

11    then we are done.

12        Oh, I'm sorry.  It appears that we may also need to call

13    an FDIC representative regarding the federal insurance aspect

14    of the federal insured lenders.

15                    THE COURT:  So what was your intent in the next --

16    the last 20, 30 minutes of the day?

17                    MR. AVEIS:  To call Ms. Ebadi.

18                    MR. ARKOW:  I can inquire -- I don't know if we can

19    reach -- the fact that the deposits were federally insured, we

20    could reach a stipulation.  If not, I think we might want to

21    call that very short witness.

22                    MR. AVEIS:  I misspoke.  I forgot that he was here.

23                    THE COURT:  So the FDIC person.  And who is the

24    other person that's short, the agent --

25                    MR. AVEIS:  Agent Mazon about Mr. Patterson's
```

```
 1    proffer statements.
 2              THE COURT:  How long do you anticipate?  A few
 3    minutes?
 4              MR. AVEIS:  I don't know how long the cross will be.
 5              THE COURT:  Okay.  So we are not going to finish
 6    today, but it looks like we will finish fairly shortly in the
 7    morning tomorrow?
 8              MR. AVEIS:  Yes, Your Honor.
 9              THE COURT:  All right.
10              (At 1:21 P.M. the proceedings adjourned.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15              DATED THIS  26TH  DAY OF MARCH, 2016.

16

17

18              /S/ MAREA WOOLRICH

19              MAREA WOOLRICH, CSR NO. 12698, CRR
                FEDERAL OFFICIAL COURT REPORTER

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**